**ESTADO LIBRE ASOCIADO DE PUERTO RICO**
**TRIBUNAL DE PRIMERA INSTANCIA**
**SALA SUPERIOR DE SAN JUAN**

| | |
|---|---|
| VITALIFE INC.<br><br>Demandante<br><br>vs.<br><br>KELLER MEDICAL INC.; ALLERGAN PLC;<br>ALLERGAN SALES, LLC.; ALLERGAN<br>SALES PUERTO RICO, INC.;<br>CORPORACIONES A, B Y C; Y FULANO<br>DE TAL<br><br>Demandados | CIVIL NÚM..: SJ2019CV13302<br><br>SALA 907<br><br>SOBRE<br><br>LEY 75 SOBRE CONTRATOS DE<br>DISTRIBUCIÓN; INJUNCTION;<br>SENTENCIA DECLARATORIA Y<br>DAÑOS Y PERJUICIOS |

**DEMANDA ENMENDADA JURAMENTADA**

AL HONORABLE TRIBUNAL:

Comparece el demandante Vitalife Inc., y por conducto de su abogado que suscribe, y muy respetuosamente expone, alega y solicita:

**I. INTRODUCCIÓN**

1.      El presente caso trata sobre los actos de terminación ilegal de los derechos de distribución exclusiva del demandante Vitalife sobre ciertos productos médicos fabricados por el co-demandado Keller Medical Inc., por instancia de los co-demandados Allergan plc y Allergan Sales LLC., y para beneficiar al co-demandado Allergan Sales Puerto Rico Inc., en violación a la Ley Núm. 75 del 24 de junio de 1964, según enmendada (10 L.P.R.A. §278 *et seq.*)("Ley 75"), y en violación de las disposiciones del Código Civil que imponen la obligación afirmativa de cumplir obligaciones contractuales de buena fe y sin cometer actos torticeros.  Se solicitan los remedios de interdicto preliminar y permanente y los daños autorizados por la Ley 75, por las Reglas 56 y 57 de Procedimiento Civil, y por la Ley de Injunctions de Puerto Rico (32 L.P.R.A. §§ 3521-3533).  Además, se solicita el remedio de Sentencia Declaratoria de la Regla 59 de Procedimiento Civil, y el de interdicto provisional y permanente para que se declaren nulas varias disposiciones contractuales que Keller alega le aplican a la relación contractual de las partes pero que son contrarias a las leyes de Puerto Rico y de Massachusetts.  Finalmente, se solicitan los remedios y daños dispuestos por el Código Civil con relación a actos que son torticeros y/o que son actos de cumplimiento doloso o de mala fe según los Arts. 1051, 1054-1060  y 1077 del

[2]

Código Civil de PR y el Art. 1802 del Código Civil.

## II. PARTES

2.     El Demandante Vitalife Inc. (en adelante **"Vitalife"**), es una corporación organizada bajo las leyes del Estado Libre Asociado, con oficinas principales localizadas en 1590 calle Cavalieri, San Juan, P.R. 00927-6129; Tel. (787) 758-0930.

3.     El Demandado Keller Medical Inc. (en adelante **"Keller"**), es una corporación foránea organizada bajo las leyes del Estado de Delaware, con oficinas principales localizadas en 5 Giralda Farms, Madison N.J. 07940. Keller no está registrada como corporación foránea en el Registro de Corporaciones del Departamento de Estado del Estado Libre Asociado de Puerto Rico, ni ha sido autorizada a hacer negocios en el Estado Libre Asociado de Puerto Rico. .El agente residente de Keller es The Corporation Trust Company, con oficinas en Corporation Trust Center, 1209 Orange St., Wilmington, DE. 19801; Tel. 302-658-7581. La oficina en Puerto Rico del agente residente es C T Corporation System, 361 San Francisco Street, Penthouse, Old San Juan, PR, 00901.

4.     El Demandado Allergan Sales, LLC. (en adelante **"Allergan Sales"**), es una compañía de responsabilidad limitada organizada bajo las leyes del Estado de Delaware, con oficinas principales localizadas en 5 Giralda Farms, Madison N.J. 07940 y en 2525 Dupont Drive Irvine, CA 92612. Allergan Sales es un subsidiaria de la compañía matriz Allergan Plc. con cede en Irlanda o de la subsidiaria Allergan USA Inc. con cede en California. Allergan Sales no está registrada como corporación foránea en el Registro de Corporaciones del Departamento de Estado del Estado Libre Asociado de Puerto Rico, ni ha sido autorizada a hacer negocios en el Estado Libre Asociado de Puerto Rico. El agente residente de Allergan Sales es CT Corporation System (C0168406), 361 San Francisco Street, Penthouse, Old San Juan, PR, 00901.

5.     El Demandado Allergan Sales Puerto Rico, Inc. (en adelante **"ASPR"**) es una corporación foránea organizada bajo las leyes del Estado de California, con oficinas principales en la Carr. 1, Km 21.1, Sector La Muda, Guaynabo, Puerto Rico, 00971-9999. ASPR está registrado como corporación foránea en el Registro de Corporaciones del Departamento de Estado del Estado Libre Asociado de Puerto Rico, y está autorizado a hacer negocios en el Estado Libre Asociado de Puerto Rico. El agente residente de ASPR es CT Corporation System, 361 San

[ 3 ]

Francisco Street, Penthouse, Old San Juan, PR, 00901.

6.      El Demandado Allergan plc (en adelante "**Allergan**") es, por información y

creencia, una corporación pública inglesa o irlandesa, con oficinas administrativas principales

localizadas en 5 Giralda Farms, Madison N.J. 07940. Allergan es la corporación matriz de los

co-demandados Keller, Allergan Sales y ASPR.

7.      Los co-demandados Corporaciones A, B y C son nombres ficticios que representan

otras corporaciones y entidades jurídicas que le son responsable civilmente al demandante por

los hechos objeto de esta Demanda pero que su identidad al presente se conoce.

8.      El co-demandado Fulano de Tal es un nombre ficticio que representa a personas

naturales que le son responsable civilmente al demandante por los hechos objeto de esta Demanda

pero que su identidad al presente se conoce.

### III. COMPETENCIA

9.      Este Honorable Tribunal tiene competencia a tenor con la Regla 3.4 de

Procedimiento Civil, toda vez que la causa del litigio surgió en San Juan.

### IV. JURISDICCIÓN *IN PERSONAM*

10.     Se adoptan por referencia los párrafos 1-8 de esta Demanda.

11.     Este Honorable Tribunal tiene jurisdicción *in personam* sobre Keller, quien es una

entidad foránea, por razón de sus contactos mínimos específicos con el foro de Puerto Rico, a

tenor con lo dispuesto en la Regla 3.1(a) de Procedimiento Civil y la jurisprudencia aplicable.

Keller ha transado negocios dentro de Puerto Rico. Keller es la corporación que contrató con

Vitalife el mercadeo y distribución de sus productos para implantar implantes mamarios en el

mercado de Puerto Rico, primero mediante un Contrato de Distribución Internacional de fecha

25 de octubre de 2011, y luego mediante un subsiguiente Contrato de Distribución Internacional

de fecha 22 de marzo de 2017. Con estos acuerdos Keller le confería al Demandante Vitalife el

derecho a distribuir de forma exclusiva sus productos para implantar implantes mamarios en el

mercado de Puerto Rico. La intención de la partes al suscribir estos contratos fue que Vitalife

continuara con la distribución exclusiva de los Productos en Puerto Rico que se inició en el 2011.

Dichos acuerdos fueron negociados, en parte, en Puerto Rico. Dichos acuerdos de distribución

requieren necesariamente que sus términos y condiciones se cumplan sustancialmente en Puerto

[ 4 ]

Rico. Dichos acuerdos, por operación de la Ley # 75, crearon una relación contractual de larga duración, mediante la cual los productos de Keller fueron, y han de ser, introducidos y mercadeados voluntaria e intencionalmente al mercado de Puerto Rico por medio de Vitalife por un tiempo indefinido. La terminación de los derechos de Vitalife se realizó en abierta violación de la Ley 75. Las reclamaciones en el caso de autos se derivan de dicha relación contractual.

12.     Este Honorable Tribunal también tiene jurisdicción *in personam* sobre Allergan Sales, quien es una entidad foránea, por razón de sus contactos mínimos específicos con el foro de Puerto Rico, a tenor con lo dispuesto en la Regla 3.1(a) de Procedimiento Civil y la jurisprudencia aplicable. Según se alega en esta Demanda, Allergan Sales llevó a cabo la compra del 100% de las acciones de Keller, que causó y/o motivó la terminación de los derechos de distribución de Vitalife protegidos por la Ley 75 y que son objeto de esta Demanda. Por información y creencia, una vez Allergan Sales adquirió el 100% de las acciones de Keller, ésta, en conjunto con su corporación matriz Allergan, tomaron la determinación de terminar los derechos de distribución de Vitalife protegidos por la Ley 75 y que son objeto de esta Demanda. Allergan Sales tomó esta determinación con pleno conocimiento que con ello le causaba daños a Vitalife, una entidad localizada en Puerto Rico, por lo que Allergan Sales intencionalmente ha interferido torticeramente con los derechos de distribución exclusiva de Vitalife.

13.     Este Honorable Tribunal también tiene jurisdicción *in personam* sobre Allergan, quien es una entidad foránea, por razón de sus contactos mínimos específicos con el foro de Puerto Rico, a tenor con lo dispuesto en la Regla 3.1(a) de Procedimiento Civil y la jurisprudencia aplicable. Según se alega en esta Demanda, Allergan propició la transacción por la cual Allergan Sales adquirió el 100% de las acciones de Keller, lo que causó y/o motivó la terminación de los derechos de distribución de Vitalife protegidos por la Ley 75 y que son objeto de esta Demanda. Por información y creencia, una vez Allergan Sales adquirió el 100% de las acciones de Keller, ésta, en conjunto con su corporación matriz Allergan, tomaron la determinación de terminar los derechos de distribución de Vitalife protegidos por la Ley 75 y que son objeto de esta Demanda. Evidencia de ello es que la carta del 24 de enero de 2018 notificando la terminación de los derechos de distribución del demandante Vitalife está suscrita por un oficial de Allergan, lo que significa que la determinación de terminar a Vitalife fue tomada, en parte, por Allergan. Allergan

[ 5 ]

tomó esta determinación con pleno conocimiento que con ello le causaba daños a Vitalife, una entidad localizada en Puerto Rico, por lo que Allergan intencionalmente ha interferido torticeramente con los derechos de distribución exclusiva de Vitalife.

14.     Este Honorable Tribunal también tiene jurisdicción *in personam* sobre ASPR, quien es una entidad foránea, por razón de sus contactos generales y contactos mínimos específicos con el foro de Puerto Rico, a tenor con lo dispuesto en la Regla 3.1(a) de Procedimiento Civil y la jurisprudencia aplicable.  Con relación a los contactos generales, por información y creencia, ASPR es titular y/o arrendataria de sus oficinas principales en Puerto Rico localizadas en la Carr. 1, Km 21.1, Sector La Muda, Guaynabo.  Allí opera un negocio de distribución de productos médicos para el mercado de Puerto Rico, utilizando múltiples empleados y contratistas independientes.  ASPR utiliza para sus operaciones propiedad mueble e inmueble localizada en Puerto Rico, empleados y contratistas de Puerto Rico, facilidades bancarias y financieras en Puerto Rico, y distribuye su mercancía por todo Puerto Rico.  Con relación a los contactos mínimos específicos, por información y creencia, ASPR es la entidad que ahora vende los productos de Keller que Vitalife previamente distribuía de forma exclusiva.  ASPR sabe, o debe saber, que Vitalife es la entidad con los derechos de distribución exclusiva sobre los productos de Keller en Puerto Rico protegido por la Ley 75, por lo que ASPR intencionalmente ha interferido torticeramente con los derechos de distribución exclusiva de Vitalife.

## V. ALEGACIONES APLICABLES A TODAS LAS CAUSAS DE ACCIÓN.

15.     Se adoptan por referencia los párrafos 1-14 de esta Demanda.

16.     Vitalife es una empresa puertorriqueña que se dedica a la venta y distribución de productos médicos en Puerto Rico.

17.     Keller manufactura productos médicos para insertar y colocar implantes mamarios conocidos como Keller Funnel ™ (en adelante "**los Productos**").

18.     Efectivo el 25 de octubre de 2011, Keller suscribió un Contrato de Distribución con Vitalife, por la cual Keller designó a Vitalife como su distribuidor exclusivo para los Productos (lo que incluía todas las modificaciones y adelantos que Keller adquiriera o realizara a dichos productos ) en Puerto Rico (en adelante "**el Contrato del 2011**").  Se aneja copia del

SJ2019CV13302 19/08/2020 11:27:23 am Entrada Núm. 16 Página 6 de 16

[ 6 ]

Contrato del 2011 como **Exhibit 1**.

19. Vitalife cumplió con todos los términos y condiciones del Contrato de 2011. Ente otros, mediante los esfuerzos de mercadeo de Vitalife, el demandante abrió el mercado de Puerto Rico a los Productos y logró ventas sustanciales de éstos. De hecho, Keller le notificó a Vitalife que estaban "muy satisfechos" con las gestiones de Vitalife de venta y mercadeo de los Productos en Puerto Rico.

20. Posteriormente, las partes suscribieron un segundo Contrato de Distribución el 22 de marzo de 2017, por el cual Allergan volvió a designar a Vitalife como distribuidor exclusivo de los Productos (lo que ahora incluía todos los productos derivados y/o mejorados del Keller Funnel ™ ) en Puerto Rico (en adelante "**el Contrato del 2017**"). Se aneja copia del Contrato del 2011 como **Exhibit 2**.

21. Nuevamente, Vitalife cumplió con todos los términos y condiciones del Contrato de 2017. Vitalife bajó un poco las ventas de los Productos en el 2017, pero ello se debió a los efectos de los Huracanes Irma y María en Puerto Rico.

22. Ahora bien, a penas sólo tres meses de que Keller y Vitalife suscribieran el Contrato del 2017, Allergan anunció públicamente el 7 de junio de 2017 que ya había acordado adquirir la totalidad de las acciones de Keller. La transacción acordada envolvía la compraventa del 100% de las acciones de Keller por Allergan Sales, subsidiaria de Allergan. Keller ya estaba negociando la venta de sus acciones a Allergan cuando suscribió el Contrato del 2017 con Vitalife. Sin embargo, Keller nunca le informó a Vitalife que estaba en proceso de ser vendido a Allergan Sales. Así las cosas, el 12 de junio de 2017, Keller le notificó a Vitalife una carta en donde le informó formalmente de su adquisición por Allergan. Se aneja copia de esta carta como **Exhibit 3**.

23. Keller continuó supliendo los Productos a Vitalife por varios meses luego de su adquisición por Allegan a través de la subsidiaria Allergan Sales.

24. No empece el cumplimiento por Vitalife de todas sus obligaciones, y de crear un mercado lucrativo para los Productos en Puerto Rico, Keller le notificó a Vitalife una carta fechada el 24 de enero de 2018, terminando el Contrato de 2017 por razón de la adquisición de Keller por Allergan. Se aneja copia de esta carta como **Exhibit 4**. Keller había incluido en el

[ 7 ]

Contrato de 2017 un nuevo Párrafo 16(b) en donde se autorizaba la terminación de dicho contrato si ocurría un cambio en los accionistas que controlaban a Keller.  Sin embargo, para esa fecha Keller ya estaba negociando su venta a Allergan, pero nunca le informó de ello a Vitalife.

25.    Luego de la carta de terminación, Keller ha estado mercadeando los Productos en Puerto Rico a través de ASPR, lo que confirma que Allergan terminó los derechos de distribución de Vitalife para que los Productos fueran vendidos en Puerto Rico a través de su subsidiaria local ASPR.

26.    El 15 de mayo de 2018, Vitalife le notificó a Keller, Allergan, Allergan Sales y ASPR una carta de abogado en donde le informó que la terminación de los derechos de distribución de Vitalife fue un acto ilegal perpetrado en abierta violación de la Ley #75.  Se aneja copia de esta carta como **Exhibit 5**.  Vitalife nunca recibió respuesta a esta carta.

27.    Que Keller se ha rehusado a reponer los derechos de distribución de Vitalife y a compensar a Vitalife por sus derechos de distribución según dispone la Ley #75.  Tampoco ha cesado de hacer ventas de los Productos directamente en el mercado de Puerto Rico a través de ASPR en violación de los derechos de distribución exclusiva de Vitalife.

28.    Que en todo momento relevante a esta Demanda, Vitalife ha cumplido con todos los requisitos legales para ser considerado un "distribuidor" protegido por la Ley 57, a saber: (i) Vitalife logró crear e incrementar un mercado para los Productos de Keller en Puerto Rico; (ii) Vitalife llevó a cabo sus esfuerzos de venta de dichos productos desde sus oficinas principales localizadas en San Juan, Puerto Rico, desde donde vendió estos Productos, entre otros, a médicos, hospitales, facilidades médico-hospitalarias, planes médicos públicos y privados, y a pacientes individuales; (iii) Vitalife regularmente compró los Productos a precios al por mayor de distribuidor, adquiriendo título sobre dicho inventario; (iv) Vitalife activamente promovió, mercadeó, y vendió los Productos de Keller por todo Puerto Rico, cerrando ventas con clientes en Puerto Rico; (v) Vitalife tomó la instrucción y educación técnica necesaria para poder vender los Productos de Keller en Puerto Rico, y llevó a cabo todas las actividades de mercadeo, venta, servicio y cobro de un distribuidor; (vi) Vitalife determinó, a su entera discreción, el precio de reventa de los Productos que vendió y llevó a cabo todos los cobros por los Productos vendidos; (vii) Vitalife es la entidad que acordó todos los términos de venta con sus clientes y compradores

[ 8 ]

de los Productos a quienes les vendió en Puerto Rico; (viii) Vitalife era el responsable por la entrega de los Productos vendidos a los clientes y compradores; (ix) Vitalife era la entidad con autoridad y capacidad para conceder términos de crédito a los clientes y compradores de los Productos a quienes les vendió en Puerto Rico; (x) Vitalife llevó a cabo sus esfuerzos de mercadeo y venta de forma independiente, lo que incluyó presentaciones, almuerzos, seminarios, etc.; (xi) Una vez Vitalife adquiría el inventario de los Productos comprado, éste era el responsable por la pérdida del mismo ("risk of loss"), y por el pago del flete y las contribuciones que aplicaran, y además era el responsable ante los clientes por la garantía, calidad y adecuacidad de los Productos; (xii) Vitalife almacenaba el inventario adquirido de los Productos en su almacén localizado en sus oficinas principales; (xiii) Vitalife asistía y aún asiste a los clientes y compradores de los Productos (generalmente médicos y hospitales, y planes médicos) sobre la manera correcta de utilizar los mismos; y (xiv) Vitalife no recibió ni recibe una comisión por la venta de los Productos de Keller, sino que su ganancia consistía en la diferencia entre el precio de compra y el de reventa de los Productos.

## VI. CAUSAS DE ACCIÓN

### Primera Causa de Acción

#### Sentencia Declaratoria de Nulidad del Contrato de 2017 por Dolo en su Formación

29.     Se adoptan por referencia los párrafos 1-28 de esta Demanda.

30.     Que Keller incluido en el Contrato de 2017 un nuevo Párrafo 16(b) en donde se autorizaba la terminación de dicho contrato su ocurría un cambio en los accionistas que controlaban a Keller.  Sin embargo, para esa fecha Keller ya estaba negociando su venta a Allergan.  No obstante, Keller nunca le informó a Vitalife que estaba incluyendo ese nuevo Párrafo 16(b) en el Contrato del 2017 porque ya estaba negociando su venta a Allergan.

31.     Que el acto de Keller de añadir el nuevo Párrafo 16(b) en el Contrato de 2017 sin informarle a Vitalife que ésta ya estaba negociando su venta a Allergan constituye una maquinación insidiosa y un dolo que anula el Contrato de 2017.

32.     Procede que el Honorable Tribunal dicte una Sentencia declarando que el Contrato del 2017 es nulo por razón de dolo según los Artículos 1221 y 1222 del Código Civil (31 L.P.R.A. §§ 3408-3409), y que la relación contractual entre Keller y Vitalife estaba gobernada

[ 9 ]

por el Contrato del 2011 y la Ley 75.

### Segunda Causa de Acción

**Terminación Sin Justa Causa de la Relación
de Distribución Exclusiva en Violación de la Ley #75**

33.  Se adoptan por referencia los párrafos 1-32 de esta Demanda.

34.  Vitalife es un "distribuidor" protegido por la Ley #75.

35.  Que la terminación por Keller de los derechos de Vitalife de distribución exclusiva de los Productos en Puerto Rico constituye una terminación sin justa causa en violación de la Ley #75.

36.  Se solicita que se compense a Vitalife bajo la Ley #75 con una cantidad no menor de $1,000,000.00 por todos los daños económicos compensables causados por la terminación ilegal de la distribución exclusiva de los Productos.

37.  Para evitar que Vitalife continúe sufriendo daños irreparables, el demandante requiere de un injunction preliminar bajo el Artículo 3-A de la Ley #75 (10 L.P.R.A. § 278b-1), ordenándole a Keller a volver a suplirle a Vitalife los Productos bajo los mismos términos y condiciones previamente acordados, y prohibiéndole a Keller a vender los Productos en Puerto Rico a través de ASPR o por algún otro tercero que no sea Vitalife.

38.  Se solicita además un injunction permanente bajo la Regla 57 de Procedimiento Civil, los Arts. 1051 y 1077 del Código Civil de PR (31 L.P.R.A. §§ 3015 y 3052), y la Ley de Injunctions de Puerto Rico (32 L.P.R.A. §§ 3521-3533) ordenándole a Keller a suplirle a Vitalife los Productos bajo los mismos términos y condiciones previamente acordados y prohibiendo a Keller a vender los Productos en Puerto Rico directamente o a través de algún tercero que no sea Vitalife, a menos de que primero ocurra justa causa según definido por la Ley 75 y su jurisprudencia.

### Tercera Causa de Acción

**Dolo y Mala Fe en el Cumplimiento del Contrato de Distribución**

39.  Se adoptan por referencia los párrafos 1-38 de esta Demanda.

40.  Tanto el Artículo 89 del Código de Comercio (10 L.P.R.A. § 1309) como el Artículo 1210 del Código Civil (31 L.P.R.A. § 3375) disponen que todo contrato (que contenga objeto y causa) se perfecciona con el mero consentimiento, y desde entonces obliga a las partes

[10]

contratantes no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso y a la ley.

41.   La buena fe, en particular, "Es una fuente que produce 'especiales deberes de conducta exigibles en cada caso, de acuerdo con la naturaleza de la relación jurídica y con la finalidad perseguida por las partes a través de ella'." Oriental Fin. Servs. v. José Juan Nieves, 172 D.P.R. 462, 471-472 (2007).

42.   A tenor con el Artículo 89 del Código de Comercio y el Artículo 1210 del Código Civil, los demandados venían obligados a no terminar los derechos de distribución exclusiva de Vitalife a menos que hubiera una justa causa.

43.   Que la terminación injustificada por Keller de los derechos de distribución exclusiva de Vitalife, y la consabida venta de los Productos por Keller directamente en Puerto Rico por conducto de ASPR, son actos de mala fe en el cumplimiento de las obligaciones contractuales, lo que a su vez constituye un acto de incumplimiento de contrato y/o cumplimiento doloso y/o negligente en violación de los Artículos 1054-1060 del Código Civil. Por lo tanto, Vitalife tiene derecho a la resolución del Contrato de Distribución según el Artículo 1077 del Código Civil, y al resarcimiento de todos los daños y perjuicios.

44.   Se solicita que se compense a Vitalife por el incumplimiento de contrato y/o cumplimiento doloso o de mala fe con una cantidad no menor de $1,000,000.00 por todos los daños sufridos y/o causados por dicho incumplimiento, lo que incluye el resarcimiento de cualquier daño sufrido no previsible.

45.   Para evitar que Vitalife continúe sufriendo daños irreparables, éste requiere de un injunction preliminar y de un injunction permanente bajo las Reglas 56 y 57 de Procedimiento Civil, los Arts. 1051 y 1077 del Código Civil de PR (31 L.P.R.A. §§ 3015 & 3052), y la Ley de Injunctions de Puerto Rico (32 L.P.R.A. §§ 3521-3533) ordenándole a Keller a volver a suplirle a Vitalife los Productos bajo los mismos términos y condiciones previamente acordados y prohibiendo a Keller a vender los Productos en Puerto Rico directamente o a través de algún tercero que no sea Vitalife, a menos de que primero ocurra justa causa según definido por la Ley 75 y su jurisprudencia.

[11]

### Cuarta Causa de Acción

#### Sentencia Declaratoria e Injunction
#### Anulando Cláusulas de Selección de Ley y de Foro

46.     Se adoptan por referencia los párrafos 1-45 de esta Demanda.

47.     El Contrato de 2011 contiene una cláusula de selección de ley, y el Contrato de 2017 contiene cláusulas de selección de ley y de selección de foro que son inválidas según la Ley #75.

48.     Que el Artículo 4 de la Ley #75 (10 L.P.R.A. § 278c) prohíbe la renuncia de los derechos provistos por dicha ley como sigue:

> "Las disposiciones del presente capítulo son de orden público y por tanto los derechos que tales disposiciones determinan no pueden renunciarse. Este capítulo, por ser de carácter reparador, deberá interpretarse liberalmente para la más eficaz protección de tales derechos; en la adjudicación de las reclamaciones que surjan a su amparo, los tribunales de justicia reconocerán los referidos derechos a favor de quien efectivamente tenga a su cargo las actividades de distribución, no empece las estructuras o mecanismos corporativos o contractuales que el principal o concedente pueda haber creado o impuesto para encubrir la verdadera naturaleza de la relación establecida."

49.     Que tanto las cláusulas de selección de ley como la cláusula de selección de foro contenidas en los Contratos del 2011 y del 2017 son nulas e ineficaces bajo el Artículo 3B de la Ley #75 (10 L.P.R.A. § 278b-2) el cual dispone como sigue:

> "Los contratos de distribución a que se refiere el presente capítulo se interpretarán de conformidad con, y se regirán por las leyes del Estado Libre Asociado de Puerto Rico, siendo nula toda estipulación en contrario.
>
> Se considerará igualmente en contravención a la política pública que informa este capítulo y, por ende, nula e inexistente, toda estipulación que obligue a un distribuidor a dirimir, arbitrar o litigar fuera de Puerto Rico, o bajo leyes o reglas de derecho foráneas, cualquier controversia que surja en torno a su contrato de distribución."

50.     Que procede que este Honorable Tribunal dicte una sentencia declaratoria según la Regla 59 de Procedimiento Civil, declarando las cláusulas de selección de ley y de selección de foro contenidas en los Contratos del 2011 y 2017 son nulas, ineficaces e inaplicables por ser contrarias a los Artículos 3B y 4 de la Ley #73. Además, procede que se dicte un Injunction preliminar y permanente prohibiéndole a los demandados a aplicar y/o a poner en práctica las cláusulas nulas de selección de ley y de selección de foro contenidas en los Contratos entre ellos.

51.     Además, las cláusulas de selección de ley y de selección de foro contenidas en los Contratos del 2011 y 2017 también son nulas, ineficaces e inaplicables bajo la Ley de Florida.

[12]

Por ende, procede que este Honorable Tribunal dicte una sentencia declaratoria según la Regla 59 de Procedimiento Civil, declarando las cláusulas de selección de ley y de selección de foro contenidas en el Contrato nulas, ineficaces e inaplicables por ser contrarias a la propia ley de Florida. Además, procede que se dicte un Injunction preliminar y permanente prohibiéndole a los demandados a aplicar y/o a poner en práctica las cláusulas nulas de selección de ley y de selección de foro contenidas en los Contratos entre ellos.

### Quinta Causa de Acción

### Interferencia Torticera bajo el Art. 1802

52.    Se adoptan por referencia los párrafos 1-51 de esta Demanda.

53.    Los co-demandados Allergan, Allergan Sales y ASPR, intencionalmente y con pleno conocimiento de la relación contractual de distribución exclusiva existente entre Keller y Vitalife han interferido ilegal e intencionalmente en dicha relación, con el consentimiento de Keller, para lograr apropiarse para sí de los derechos de distribución exclusiva de los Productos en Puerto Rico. Ello constituye un acto de interferencia torticero bajo el Artículo 1802 del Código Civil. En el caso particular de ASPR, sus ventas de los Productos con conocimiento de los derechos de exclusividad de Vitalife constituye un acto de interferencia torticero según lo resuelto en General Office Pros. Corp. v. A. M. Capen's Sons, Inc., 115 D.P.R. 553 (1984).

54.    Que los actos de interferencia torticera perpetrados por Allergan, Allergan Sales y ASPR le han causado, y continúan causándole a Vitalife, daños en una cantidad no menor de $1,000,000.00, lo que incluye las ganancias que Vitalife dejará de percibir de los Productos que ASPR vende ilegalmente en Puerto Rico.

### Sexta Causa de Acción

### Sentencia Declaratoria para Declarar
### Nulidad de Contratos en Daño a Tercero

55.    Se adoptan por referencia los párrafos 1-54 de esta Demanda.

56.    Que Keller ha establecido relaciones contractuales de distribución de los Productos en Puerto Rico con ASPR y/o otros terceros, las cuales son nulas por ser contratos que en daño a tercero según Dennis v. City Fed. Savs. & Loan Ass'n, 121 D.P.R. 197 (1988).

57.    Procede que este Honorable Tribunal dicte una Sentencia Declaratoria declarando nulos dichos contratos entre Keller y ASPR y/o otros terceros según Dennis v. City Savs. &

[13]

Loan Ass'n, 121 D.P.R. 197 (1988).

### Séptima Causa de Acción

### Daños y Perjuicios bajo el Art. 1802

58.  Se adoptan por referencia los párrafos 1-57 de esta Demanda Enmendada.

59.  Los Demandados han llevado a cabo actos negligentes y/o intencionales dirigidos a privar a Vitalife de su distribución exclusiva de los Productos en Puerto Rico, los cuales le han causado daños a Vitalife. Entre otros, Keller está vendiendo los Productos directamente en Puerto Rico a través de ASPR en violación de los derechos de Vitalife de distribución exclusiva protegidos por la Ley 75. Ellos constituyen actos torticeros bajo el Artículo 1802 del Código Civil.

60.  Que los actos negligentes y/o intencionales de los demandados para privar a Vitalife de sus derechos de distribución le han causado, y continúan causándole a Vitalife, daños en una cantidad no menor de $1,000,000.00.

**POR TODO LO CUAL**, muy respetuosamente se solicita que el Honorable Tribunal declare **CON LUGAR** la presente Demanda, **DETERMINE** que la terminación de los derechos de distribución de Vitalife fue un acto en violación de la Ley #75 además de un acto de cumplimiento doloso o de mala fe, un acto torticero, y un acto de interferencia torticera, y que en su consecuencia, **CONDENE** a los demandados al pago de las cantidades aquí reclamadas.

Se solicita también que se **DICTE** la Sentencia Declaratoria declarando: (1) el Contrato del 2017 nulo por dolo en la formación; (2) que las cláusulas de selección de ley y de selección de foro contenidas los Contratos del 2011 y 2017 son nulos y contrarios a la Ley 75; y (3) que los contratos de distribución de los Productos entre Keller y ASPR y/o otro tercero es nulo por ser contratos en daño a tercero.

Se solicita también que se **DICTE** el correspondiente Injunction preliminar y permanente prohibiéndole a Keller a aplicar y/o a poner en práctica las cláusulas nulas de selección de ley y de selección de foro contenidas en los Contratos entre las partes, y se **DICTE** los injunctions preliminares y permanentes aquí solicitados re-estableciendo la relación de distribución y prohibiendo a Keller vender los Productos en Puerto Rico directamente o a través de algún tercero que no sea Vitalife, a menos de que primero ocurra justa causa según definido por la Ley 75 y su

[ 1 4 ]

jurisprudencia, y le **ORDENE** a Keller que le reembolse a Vitalife todos los gastos, costas y

honorarios de abogado que dicha parte demandante incurra en el pleito de autos.

RESPETUOSAMENTE SOMETIDO.

En San Juan, Puerto Rico, hoy -18- de agosto de 2020.

BUFETE LUIS A. MELENDEZ-ALBIZU
(Abogado de la Parte Demandante)
117 Ave. De Diego,
Urb. San Francisco,
San Juan, P.R. 00919-5602
Tel. (787) 313-0283
Email: LMA@melendezalbizulaw.com
Email: melendezalbizulaw@gmail.com


*s/Lcdo. Luis A. Meléndez Albizu*
LIC. LUIS A. MELENDEZ-ALBIZU
RUA Tribunal Supremo Núm. 9,187
Colegiado Número: 10440

/003

SJ2019CV13302 19/08/2020 11:27:23 am Entrada Núm. 16 Página 15 de 16

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA SUPERIOR DE SAN JUAN

| | |
|---|---|
| VITALIFE INC. | CIVIL NÚM..: SJ2019CV13302 |
| Demandante | SALA 907 |
| vs. | |
| | SOBRE |
| KELLER MEDICAL INC.; ALLERGAN PLC;<br>ALLERGAN SALES, LLC.; ALLERGAN<br>SALES PUERTO RICO, INC.;<br>CORPORACIONES A, B Y C; Y FULANO<br>DE TAL | LEY 75 SOBRE CONTRATOS DE<br>DISTRIBUCIÓN; INJUNCTION;<br>SENTENCIA DECLARATORIA Y<br>DAÑOS Y PERJUICIOS |
| Demandados | |

### DECLARACIÓN JURADA DE
### CARLOS A. SÁNCHEZ VÁZQUEZ

YO, CARLOS A. SÁNCHEZ VÁZQUEZ, mayor de edad, casado, Presidente de Vitalife Inc. ("Vitalife"), y vecino del Municipio de San Juan, declaro bajo juramento lo siguiente:

1. Que mis circunstancias personales son las antes indicadas.

2. Que soy Presidente del Vitalife.

3. Que Vitalife está radicando una Demanda Enmendada Juramentada.

4. Que los hechos expuestos en la susodicha Demanda Enmendada Juramentada son ciertos según mi mejor saber y conocimiento personal.

5. Que suscribo esta Declaración Jurada bajo juramento para dar fe de la veracidad de lo anterior.

En San Juan, Puerto Rico hoy _15_ de agosto del 2020.

CARLOS A. SÁNCHEZ VÁZQUEZ

AFIDÁVIT NÚM.: _2578_

JURADO Y SUSCRITO ante mí por CARLOS A. SÁNCHEZ VÁZQUEZ, de las circunstancias personales antes descritas, a quien doy fe de identificar mediante su Licencia de Conducir Núm. _800279_, expedida por el Departamento de Transportación y Obras Públicas del Estado Libre Asociado de Puerto Rico, y la cual tiene su firma y retrato a tenor

[ 2 ]

con el Artículo 17(c) de la Ley Notarial de Puerto Rico vigente.  Por la presente se certifica que adherí el Sello para la Sociedad para Asistencia Legal al margen de la nota correspondiente al presente afidávit inscrito en mi libro de Testimonios, y cancelé el mismo con mi sello notarial o con una marca clara y visible.  Además, adherí en este afidávit la otra estampilla de la Sociedad para Asistencia Legal y cancelé la misma con mi sello notarial o con una marca clara y visible.  En San Juan, Puerto Rico, hoy día _18_ de agosto de 2020.

NOTARIO PÚBLICO

SJ2019CV13302 19/08/2020 11:27:23 am Entrada Núm. 16 Página 1 de 12

# Keller Medical, Inc.

International Distributor Agreement

Between

Vitalife, Inc

As "Distributor"

And

Keller Medical, Inc.

Dated:   25 October 2011

Exhibit 1

This International Distributor Agreement (this "Agreement") is made as of 1 November 2011 (the "Effective Date") by and between Vitelife, Inc. ("Distributor") with its principal offices at 1590 Cavalieri Street San Juan, PR 00927 and Keller Medical, Inc. (the "Supplier") with its principal offices at 609 SE Central Parkway, Stuart, FL , USA, 34994.

In consideration of the mutual promises contained herein, the parties agree as follows:

1.  DEFINITIONS

(a)  "Confidential Information" means such data or information as may be disclosed to the Distributor or to which the Distributor is given access by (i) the Supplier or (ii) nominated parties on the Supplier's behalf for the purposes of this Agreement and which by its nature is confidential. Examples of Confidential Information include data or information about the business or affairs of the Supplier about their Products, designs, materials, technology, formulae, fabrication methods or research activities. Confidential Information may also include, and encompasses (but is not limited to,) data made available by manufacturer of the Products, or manufacturers of raw materials which are used in the Products. Confidential Information may be disclosed orally or in writing. All information or data disclosed or for which the Distributor is given access for Registration purposes is to be deemed confidential.

(b)  "The Territory" shall mean Puerto Rico and he Caribbean.

(c)  "Products" shall mean the Keller Funnel™ products described in this Agreement, hereto as amended from time to time, including all modifications and improvements introduced or acquired from time to time by the Supplier.

(d)  "Intellectual Property" means any patent, copyright, registered or unregistered design, Trade Mark (whether registered or unregistered), trade names, database rights or any other industrial or intellectual property right of the Supplier, including those subsisting in respect of the Products, and applications for any of the foregoing.

(e)  "Registration" means all registrations, permissions, consents, approvals or licenses (including, without limitation, those required to be made with or given by (as appropriate) any governmental department or any body constituted under the law of the Territory for licensing or other regulatory purposes relating to the Products) required to enable the Products to be lawfully marketed, distributed and sold in the Territory and "Registrations" shall be construed accordingly.

(f)  "Regulatory Body" means any government department or any body constituted under any applicable laws for licensing or other regulatory purposes relating to the Products and whose approval, permission or consent, is required to enable the Products to be lawfully marketed, manufactured, distributed and sold in the Territory.

(g)  "Trade Marks" means

(i)  the Trade Marks (if any) which (in the case of a registered trade mark) are registered in the name of the Supplier or (in the case of unregistered trade marks) are the property of the Supplier and which (in either case) are used by the Supplier as at the date of this Agreement on or in relation to the Products;

Page 2 of 12

Exhibit 1

(ii)   such other Trade Marks as are used by the Supplier on or in relation to the Products at any time during this Agreement.

(h)   The headings to the clauses in this Agreement are for convenience only and shall not affect the construction hereof.

2.   APPOINTMENT

(a)   With effect from the date hereof, the Distributor is hereby appointed exclusive distributor of the Supplier for the Territory, for the purpose of holding stocks of and distributing by way of sale, the Products for the period and on the terms set out below.

3.   PRODUCT

(a)   For the purpose of this Agreement, the Product is the Keller Funnel™, provided by the Supplier to the Distributor, in case lots of 6 boxes (30 funnels per case). A single box of product contains 5 each, individually packaged, sterile, Keller Funnels ™. Product code: KS-005.

(b)   The Supplier shall be entitled, by giving one month's notice in writing to the Distributor, to extend the scope of this Agreement to include any product manufactured or supplied by it, or to remove from the scope of this Agreement any obsolete Products provided by the Supplier.

4.   TERMS OF SUPPLY



(a)   The supply of all Products from the Supplier to the Distributor shall be governed by the Supplier's terms and conditions of sale, as amended from time to time, except in so far as they are inconsistent with the express terms of this Agreement. Delivered Products by the Supplier to the Distributor shall be at the Distributor's risk.



(b)   Notwithstanding any other provision of this Agreement, the Supplier reserves the right to decline to accept any order or part of any order for the Products received from or through the Distributor.

5.   PRICES

(a)   The transfer price payable by the Distributor for Products as described in 3 (a) shall be as follows:

Transfer Price:

| | |
|---|---|
| Per each sterile Keller Funnel™ | $ 50.00 |
| 1 Case of 6 boxes of KS-005 - 1 box of 5 each Keller Funnels™ | $1500.00 |

(b)   As mentioned in 3 (a) the products are packaged in box lots that contain 5 (five) each individually packaged, sterile, Keller Funnels™.

(c)   The prices payable under sub-clause (a) may need to be increased from time to time, at the discretion of the Supplier, provided that the Supplier shall give 45 days' written notice to the Distributor of any such increase, the Supplier shall use reasonable endeavors to not increase prices during the term of this agreement.

Page 3 of 12

Exhibit 1

6.    TERMS AND CONDITIONS OF SALES

(a)    The terms of the sale:

A payment of 50% of the purchase order placed by the Distributor is due prior to the Supplier processing any order for shipment. The remaining balance of 50% is due from the Distributor on receipt of the shipment by the Distributor. The Distributor may provide payment by electronic wire transfer, credit card or any other means that is acceptable to the Supplier. The Supplier reserves the right to review and change the method of payment it will accept at any time. Once an order from the Distributor is accepted by the Supplier, and the 50% payment for the order is received, the Supplier will process and ship the order to the Distributor.

(b)    Products shall be packed in Manufacturer's standard shipping cartons and delivered to Distributor's carrier F.O.B., Manufacturer's distribution site. On their delivery, title and risk shall pass to Distributor. Manufacturer shall deliver Products to the carrier selected by Distributor. In the event that Distributor does not provide written notice of such carrier, Manufacturer shall select the carrier. All freight, insurance, and all related shipping costs where applicable, shall be paid by Distributor.

(c)    Products shall be packed in Manufacturer's standard shipping cartons suitable for air or sea handling.

(d)    The Distributor warrants that it is not, at the time of entering into this Agreement, insolvent and knows  of no circumstances which would entitle any creditor to appoint a receiver or to petition for winding up or to exercise any other rights over or against its assets.



7.    DUTIES OF THE DISTRIBUTOR

(a)    At its own cost, the Distributor will use its best endeavors to introduce, sell, and at all times to actively promote and extend the sale of all Products in all parts of the Territory, to all surgeons, hospitals, surgery centers, and private practices that engage in the practice of providing and performing primary and reconstructive breast augmentation, including participation in tenders and attendance as an exhibitor at all major congresses relevant to the products in the Territory. This provision is of the essence of this Agreement, and the basis on which the Supplier has consented to enter into it, and any failure by the Distributor to carry out the provisions of this sub-clause shall be deemed to be a breach of the Agreement.

(b)    On an annual basis, Distributor will submit to Manufacturer its marketing plan, prepared by Distributor in good faith, for the Products, in the Territory. Such plan shall include, at minimum, anticipated quantities of the Products to be purchased: estimated sales volume; promotional plans and activities, and information on competitive products. For planning purposes, distributor will in good faith, supply on a quarterly basis a projection of required quantity of sterile product for sale and sample product for training.

(c)    In purchasing the Products, the Distributor is bound by the Supplier's conditions of sale and from time to time the Supplier may make modifications in selling the Products. The Distributor further agrees that it will not  make any promises, representations, warranties or guarantees with reference to the Products except as are consistent with those conditions or as are expressly authorized in writing by the Supplier.

Page 4 of 12

Exhibit 1

SJ2019CV13302 19/08/2020 11:27:23 am Entrada Núm. 16 Página 5 de 12

(d)     The Distributor will use only marketing and advertising material for the Products which incorporates the Trade Marks, and has been approved by the Supplier in terms of content, design and artwork and comply with any directions or guidelines in relation thereto issued by the Supplier from time to time.

(e)     The Distributor will not incur any liability on behalf of the Supplier nor in any way purport either to pledge the Supplier's credit or to accept any order or to make any contract binding upon the Supplier.

(f)     The Distributor will promptly bring to the notice of the Supplier any information which it now has or may be received by it in the future which is likely to be of interest, use or benefit to the Supplier, in relation to the marketing of the Products whether in the Territory or otherwise.

(g)     The Distributor will not alter the Products or their packaging, and comply fully with the legal and health requirements for the Products and their use, sale and traceability in the Territory.

(h)     Notwithstanding termination of this Agreement, the Distributor will retain for a minimum period of (5) five years, all traceability records, including Lot Numbers, and will comply fully with the Suppliers' instructions for any recall of Products or requests for information regarding traceability of any Product. Traceability records will not be destroyed without the written authorization of the Supplier.

(i)     In dealing with or handling the Products, the Distributor will follow the reasonable instructions of the Supplier, and will provide storage for the Products to a standard so as to ensure no contamination or infection thereof, and no deterioration in the quality or appearance thereof.

(j)     Keep the Supplier fully informed of any change in the shareholdings or control of the Distributor or management of its business.

(k)     In the event of a dispute arising between the Distributor and a customer or prospective customer, the Distributor will inform the Supplier and provide the Supplier with details of circumstances of the dispute and Distributor will not enter into any compromise in respect of it or release any debt without the prior written consent of the Supplier.

(l)     The Distributor will submit to the Supplier, full details and copies of all reports, applications, submissions and correspondence to any government department or Regulatory Body, which have been compiled for Registration or other purposes in terms of this Agreement. Furthermore, the Distributor will also submit to the Supplier any decisions, determinations, certificates and other documentation which It receives from any government department or Regulatory Body in relation to Registration matters or otherwise for the purposes of this Agreement.

(m)     The Distributor acknowledges that such Intellectual Property rights as subsist in the Products and the process of their manufacture belong to the Supplier, and the Distributor will ensure that it takes all steps as the Supplier may require to safeguard such interests in such Intellectual Property and, will ensure that such Intellectual Property is clearly marked as confidential and proprietary to the Supplier (as appropriate). In addition, the Distributor will ensure that it properly notifies any Regulatory Body in the Territory to whom it makes any report, application or submission of the rights given to the Supplier under this Agreement with respect to Registrations.

(n)     The Distributor will conduct its business generally in accordance with all applicable laws and regulatory requirements.

Page 5 of 12

Exhibit 1

SJ2019CV13302 19/08/2020 11:27:23 am Entrada Núm. 16 Página 6 de 12

(o)     The Distributor will indemnify and keep indemnified the Supplier from and against any and all loss damages or liability (whether criminal or civil ) suffered, and legal fees or costs incurred by the Supplier resulting from a breach of this Agreement by the Distributor including any act of neglect  or default of the Distributor's agents, employees, licensees or customers.

(p)     Prohibited Sales. Distributor agrees not to sell, and agrees to use commercially reasonable efforts to ensure that Distributor's agents and customers do not sell or use, any of the Products outside of the Territory.

8.      DUTIES OF THE SUPPLIER

(a)     The Supplier hereby undertakes and agrees with the Distributor that it will, at all times while this Agreement is in force, observe and perform the terms and conditions hereof.

        (i)      The Supplier agrees to use reasonable commercial efforts to fulfill orders received from the Distributor, but shall be under no liability to the Distributor for any delay or failure to make delivery of Products, other than a delay or failure caused by its own willful default to comply with the terms of an order accepted by it.

        (ii)     the Supplier agrees to supply to the Distributor or (alternatively, at the Supplier's discretion) directly to any Regulatory Body such information relating to the Products manufactured by the Supplier which the Distributor may reasonably require to enable the Distributor to register, promote and sell the Products in the Territory.

        (iii)    the Supplier may decline to supply to the Distributor information relating to the Products or such similar products which is valuable proprietary information of either the Supplier or third parties

        (iiii)   the Supplier agrees, for the duration of this Agreement, to provide the Distributor with such technical advice as the Distributor shall reasonably require in order effectively to carry on its business relating to the Products.

9.      PRODUCT LEVELS

(a)     The "term of this Agreement" shall mean the period of 24 months commencing on the effective date of this agreement.

(b)     The Minimum Number of 60 cases of KS-005 will be purchased by the Distributor from the Supplier in the term of this Agreement per the following schedule:

        (i)      Minimum Number of 20 cases of KS-005 shall be be purchased per the first 12 months of the term of this Agreement, according to the following schedule:

        Initial Opening Stocking Order in the First Quarter          4  Cases of Product
        Second Quarter (Feb 12- Apr 12)                              4Cases of Product
        Third Quarter (May 12- July 12)                              6 Cases of Product
        Fourth Quarter ( Aug 12-Oct 12)                              6Cases of Product

Page 6 of 12

Exhibit 1

(ii)    Minimum Number of 40 cases of KS-005 shall be purchased during the second 12 months of the term of this Agreement according to the following schedule:

|  |  |
|---|---|
| First Quarter (Nov 12- Jan 13) | 8 Cases of Product |
| Second Quarter (Feb 13-Apr 13) | 10 Cases of Product |
| Third Quarter (May13-July 13) | 12 Cases of Product |
| Fourth Quarter ( Aug 12-Oct 13) | 10 Cases of Product |

(c)    If the Distributor shall fail to purchase from the Supplier the Minimum Number of Cases of the Products as specified, then the Supplier shall be entitled to either terminate this Agreement, or seek a remedy that may modify the Minimum Order requirements in sub-clause 9 (b) (i) (ii).

(d)    In addition to the intial stocking order Keller Medical will provide at the distributors expense the following marketing materials in support of the distribution of the Keller Funnel:

|  |  |
|---|---|
| a) 24 ea Non-Sterile, Keller Funnels for demonstration | $ 265.00 per bundle |
| b) 100 ea Keller Funnel Tri-fold Product Brochure | $  48.00 per bundle |
| c) 100 ea Keller Funnel Tri-fold Patient Brochure | $  48.00 per bundle |

At the Distributors request, Keller Medical will use reasonable business efforts to make available to the Distributor any other additional marketing materials it may already have on hand for the U.S. market, at nominal prices to cover production and handling expenses.

10.    PROMOTION AND RESTRICTIONS



(a)    While this Agreement is in force, the Distributor hereby undertakes that it will not be concerned or interested either directly or indirectly in the research, development or manufacture of any goods; and or the sale or distribution of any goods in the Territory; which are the same as or similar to, or competitive with the Products.



(b)    In order to further sales of the Products, the Distributor agrees that during this Agreement, the Supplier shall be entitled to make reference to the Distributor (including relevant contact details, and in particular, the name of an individual contact) on its website and marketing and advertising literature as being the distributor for the Products in the Territory; and to set up, with the Distributor's assistance, a link or connection from the Supplier's website from time to time to the Distributor's website (if any), from time to time to enable the Supplier's customers to navigate seamlessly to the home page of the Distributor's website or directly to other appropriate pages of the website relating to the Products.

(c)    Distributor will not promote the sale of the product or sell the product within the territory at any price, including any discounts, less than that agreed to in writing by both parties as part of the Distributors annual marketing plan in accordance with its duties under Section 7 (b). In the event of a dispute between the parties, Keller Medical will have in its sole discretion final authority to establish minimum prices for which the product may be promoted or sold in the territory. In the event product is promoted for sale or sold at less than the agreed upon minimum pricing, it will be deemed a material

Page 7 of 12

Exhibit 1

breach of this agreement and Keller Medical at its sole discretion may exercise it rights to terminate this agreement in accordance with section 15 Early Agreement Termination.

11.      INDEMNIFICATION AND WARRANTIES

(a)      The Supplier warrants to the Distributor that all Products supplied to the Distributor will conform to any relevant description, sample or specifications issued by the Supplier will be manufactured with reasonable care and will not be defective at time of shipment, will have information in printed form about the use of the Products, and any conditions of such use which are necessary to ensure safety, together with any appropriate warnings or cautions.

(b)      If any Products covered by the warranty do not conform with the terms of such warranty, the Distributor shall be entitled to require the Supplier to take back such Products for examination and, if shown by such examination to be defective, to replace them with Products conforming to the terms of the said warranty, provided that any such defective Products are returned promptly to the Supplier, along with full quality control details and in compliance with the Supplier's Product return procedures.

(c)      Any Product to be returned must have prior authorization by the Supplier before it is returned by the Distributor and any returned product which has been in contact with human tissue, or suspected of being contaminated with biohazardous material must be accompanied by a decontamination certificate from the third party and properly packaged and labeled as such.

(d)      The Supplier will indemnify the Distributor against injury to third parties to the extent caused by any manufacturing or design defects of Products purchased by the Distributor from the Supplier under this agreement.

(e)      The Indemnity shall not apply to the extent that any manufacturing or design defect which is caused by, or results from, whether directly or indirectly, any use of Products by the Distributor; any misuse or abuse of Products by third parties; any alteration, adaptation, modification, change or adjustment to Products by the Distributor or any third party, not previously approved by the Supplier in writing; or any failure by the Distributor, or any third party to follow any operational or storage instructions or guidelines for the Products.

(f)      Once the Products are delivered to the Distributor, the Distributor has complete right of ownership of the Products and does agree to indemnify and keep indemnified the Supplier in respect of any proceedings, action or claim of any nature whatever against the Supplier made or brought by a purchaser of the Products from the Distributor, except in cases involving manufacturer's or product's defect as well as non performance while in compliance with Clause 7 (c).

12.      CONFIDENTIAL INFORMATION

(a)      The Supplier agrees not to disclose to any third party any information relating to the business of the Distributor, except as necessary for the performance of this Agreement, or to the extent that such information is generally available to the public.

(b)      The Distributor agrees that it shall not disclose to any third party any Confidential Information of the Supplier, and that the Distributor will use such Confidential Information only for the purposes of fulfilling its obligations under this Agreement.

Page 8 of 12

Exhibit 1

(e)     The Distributor agrees that Confidential Information will be returned to the Supplier immediately upon request with all copies, and that no copies will be retained by the Distributor or any agents  appointed by the Distributor.

13.     REGISTRATIONS AND INTELLECTUAL PROPERTY

(a)     The Supplier authorizes the Distributor to use the Trade Marks and other registrations in the Territory in relation to the Products for the purposes of exercising its rights and performing its obligations under this Agreement.

(b)     Except as provided in sub-clause (1), the Distributor shall have no rights in respect of any trade names or Trade Marks or registrations used by the Supplier in relation to the Products or of any associated goodwill, the Distributor acknowledges that, except as expressly provided in this Agreement, it shall not acquire any rights in respect thereof and that all such rights and goodwill are, and shall remain, vested in the Supplier.

(c)     In relation to the Intellectual Property of the Supplier, the Distributor agrees that it will not cause or permit anything which may damage or endanger the Supplier's rights to the Intellectual Property or the Supplier's title, or assist or allow others to do so; and will bring to the attention of the Supplier any improper or unlawful use or infringement, and without prejudice, use every effort to safeguard  the rights and the interests of the Supplier.

(d)     If at any time during this Agreement the Distributor makes or discovers any improvements to the Products or the marketing of the Products, the Distributor will provide the Supplier with all details; and acknowledge that the property in any such improvement belongs to the Supplier.

(e)     The Distributor shall not:

      (i)     alter, remove or tamper with any Trade Marks, numbers or other means of identification used on or in relation to the Products;

      (ii)     use any of the Trade Marks in any way which might prejudice their distinctiveness or validity or the goodwill of the Supplier therein;

      (iii)     use in the Territory any Trade Marks or trade names so resembling any Trade Mark or trade names of the Supplier as to be likely to cause confusion or deception; or

      (iiii)     apply for registration of, or use, any internet domain name so resembling any Trade Mark or trade name of the Supplier as to be likely to cause confusion or deception.

(f)     In relation to Registrations the Distributor agrees that:

      (i)     in so far as it is competent under the laws of the Territory, the Distributor will apply for all Registrations and at all times shall maintain and renew such Registrations in the Territory;

      (ii)     the Distributor will not allow any Registrations to lapse and will apply for any renewal of such Registrations;

Page 9 of 12

Exhibit 1

(iii)   the Distributor will at all times act in accordance with the laws of the Territory and not commit any act which would adversely affect the Registrations;

(iiii)   it will take all such steps and do such things as may be required in order to transfer to the Supplier the benefit of the Registrations under the laws of the Territory, including executing any document or documents required to effect such transfers under the laws of the Territory, in compliance with all formalities of the laws of the Territory;

14.   AGREEMENT TERM

(a)   Subject to the provisions for early termination, the agreement shall continue in force until 31 Dec. 2013

(b)   During the period of 45 days prior to the termination of this Agreement, pursuant or otherwise upon the giving of notice by the Supplier to the Distributor to terminate this Agreement, the Supplier shall be entitled to appoint the Distributor's successor (if any) and allow him to make himself known as the Supplier's distributor able to do business from the day after the termination of this Agreement.

15.   EARLY AGREEMENT TERMINATION

(a)   Either party may terminate this agreement at any time, provided that they give the other party not less than 45 days written notice to expire at any time after such date if either party:

(i)   Shall have committed a breach of this Agreement

(ii)   Is unable to pay its debts or enters into liquidation, whether compulsorily or voluntarily, or compounds with or convenes a meeting of its creditors, or has a receiver appointed of all or any part of its assets, or takes or suffers any similar action in consequence of a debt, or ceases for any reason to carry on business or any similar occurrence under any jurisdiction affects the Distributor.

(b)   If there is a change in control of ownership of the Supplier, then the Distributor may elect to terminate this Agreement; if there is a change in control of ownership of the Supplier, the Supplier may terminate this Agreement for any reason whatsoever without cause.

(c)   The Supplier may terminate this Agreement by providing the Distributor with 45 days written notice along with payment in U.S. funds equal to 1.5 times the total dollar amount paid by the Distributor for purchases of product made in the prior 3 month period plus an additional payment in an amount equal to the purchase price for the return of any unused marketing materials the Distributor may have remaining in its direct possession.

(d)   Upon the termination of this Agreement, the Distributor shall cease to hold itself out as having any rights to distribute the Products, except for the purpose of fulfilling orders accepted by it prior to the date of termination, but it is agreed that in the event of termination of this Agreement, the Distributor shall be entitled to sell any stocks of Products which it may still have at the date of termination.

Page 10 of 12

Exhibit 1

SJ2019CV13302 19/08/2020 11:27:23 am Entrada Núm. 16 Página 11 de 12

(d)    The Distributor shall, at its own expense, promptly return to the Supplier any promotional samples and materials.

16.    ASSIGNMENT

(A)    Neither party shall assign, sub-contract, transfer or charge any of its rights or obligations under this Agreement.

17.    FORCE MAJEURE

(a)    Neither party shall be liable to the other for any default hereunder, where the default is due to causes beyond the control of the party in default, provided that any party seeking to rely on this provision shall give written notice to the other containing full particulars of the act or matter which it claims has put the due performance of its obligations under this Agreement beyond its control, and provided further that this clause shall cease to apply when such act or matter has ceased to have effect on the performance of this Agreement.

18.    GOVERNING LAW

(a)    This Agreement shall be governed by the laws of the state Florida of the United States without regard to its conflicts of law rules.




19.    NOTICES

(a)    Any notice or other communication required or permitted by this Agreement to be given to a party shall be in writing and shall be deemed given if delivered personally or by commercial messenger or courier service, or mailed by U.S. registered or certified mail (return receipt requested), to the party at the party's address written below or at such other address as the party may have previously specified by like notice. If by mail, delivery shall be deemed effective three business days after mailing in accordance with this section.

    (i)    If to the Company to:    Keller Medical,
    ATTN: COO
    609 SE Central Parkway
    Stuart, FL 34996

(b)    If to Distributor, to the address for notice on the signature page to this Agreement or, if no such address is provided, to the last address of Distributor provided by Distributor to the Company.

20.    REGULATORY REQUIREMENTS

(a)    The Distributor acknowledges that the Supplier is subject to regulation by regulatory bodies in the countries in which they operate. The Supplier needs to be able to comply with the requirements of their regulators and all legal requirements of the countries in which they operate. The Distributor agrees that it will give the Supplier all assistance and information required to comply with these requirements.

Exhibit 1

SJ2019CV13302 19/08/2020 11:27:23 am Entrada Núm. 16 Página 12 de 12

21.   AGREEMENT AND GENERAL VARIANCE

(a)   This Agreement constitutes the entire understanding of the parties and there are no promises, terms, conditions or obligations, whether oral or written, express or implied, other than those contained or referred to herein, and no amendment shall be valid unless accepted in writing by both parties.

(b)   In the event that any provision of this Agreement is declared by any judicial or other competent authority to be void, voidable, illegal or otherwise unenforceable in whole or part, the other provisions of this Agreement and the remainder of the affected provision shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

DISTRIBUTOR                                    KELLER MEDICAL, INC.

By:                                            By:

Name: Carlos A. Sánchez Vázquez               Name: W. Scott Wade

Title: President                               Title: Chief Operations Officer

Address:  1590 Cavalieri St.

San Juan, PR 00927-6129

Page 12 of 12

Exhibit 1

SJ2019CV13302 19/08/2020 11:27:23 am Entrada Núm. 16 Página 1 de 13

# Keller Medical, Inc.

## International Distributor Agreement

### Between

### Vitalife, Inc

### As "Distributor"

### And

### Keller Medical, Inc.

### Dated March 22, 2017

Keller Medical _____   Vitalife Inc. _____

1 | P a g e
Exhibit 2

This International Distributor Agreement (this "Agreement") is made as of October 5, 2015 (the "Effective Date") by and between Vitalife Inc. (the "Distributor") with its principal offices at 1590 Cavalieri Street, San Juan PR 00927 and Keller Medical, Inc. (the "Supplier" or "Keller Medical") with its principal offices at 1239 S.E Indian Street, Suite 112, Stuart, FL 34997 USA.

In consideration of the mutual promises contained herein, the parties agree as follows:

1.      DEFINITIONS

(a)     "Complaint" means any written, electronic, or oral communication that alleges deficiences related to the identify, quality, durability, reliability, safety, effectivness, or performance of a device after it is released for distirubiton.

(b)     "Confidential Information" means all non-public data and information of Supplier, including any proprietary information, technical data, trade secrets or know how, including research, product plans, products, services, customers, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information of Supplier communicated, orally, electronically, or in writing, to Distributor. The foregoing provisions shall not apply, or shall cease to apply, to Confidential Information if such information: (i) is known to Distributor at the time of disclosure to Distributor by Company as evidenced by written records; (ii) becomes public knowledge without a breach of confidence by Distributor or any third party; or (iii) is required to be disclosed pursuant to any statutory or regulatory provision or court order (provided that Distributor promptly notifies Supplier of such potential required disclosure and assists Supplier in preventing or limiting such disclosure). All information or data disclosed or for which the Distributor is given access for Registration purposes is to be deemed confidential.

(c)     "The Territory" shall mean Puerto Rico and the Caribbean

(d)     "Products" is defined in sub-clause 3(a).

(e)     "Intellectual Property" means any patent, copyright, registered or unregistered design, Trade Marks (whether registered or unregistered), trade names, database rights, inventions, know-how, trade secrets or any other intellectual property relating to the design, manufacture, operation or service of the Products and applications for any of the foregoing.

(f)     "Registration" means all filings, authorizations, registrations, permissions, consents, approvals, licenses and similar requirements (including, without limitation, those required to be made with or given by (as appropriate) any governmental department or any body constituted under the law of the Territory for licensing or other regulatory purposes relating to the Products) required to enable the Products to be lawfully marketed, distributed and sold in the Territory and "Registrations" shall be construed accordingly.

(g)     "Regulatory Body" means any government department or any body constituted under any applicable laws for licensing or other regulatory purposes relating to the Products and whose authorization, approval, permission or consent is required to enable the Products to be lawfully marketed, manufactured, distributed and sold in the Territory.

(h)     "Trade Marks" means

        (i)     the trade marks (if any) which (in the case of a registered trade mark) are registered

Keller Medical _____   Vitalife Inc. _____                    2 | P a g e

                                                                       Exhibit 2

in the name of the Supplier or (in the case of unregistered trade marks) are the property of the Supplier and which (in either case) are used by the Supplier as at the date of this Agreement on or in relation to the Products;

(ii)   such other trade marks as are used by the Supplier on or in relation to the Products at any time during this Agreement.

(i)   The headings to the clauses in this Agreement are for convenience only and shall not affect the construction hereof.

## 2.   APPOINTMENT

(a)   With effect from the date hereof and as long as Distributor is complying with this Agreement, the Distributor is hereby appointed exclusive distributor of the Supplier for the Territory for the purpose of holding stocks of and distributing by way of sale the Products for the period and on the terms set out below.

(b)   Distributor shall not appoint or use any third parties to market, sell or distribute the Products unless Supplier has approved in writing any such subdistributors and Distributor's written agreement authorizing such subdistributor to market, sell or distribute Products.

(c)   Distributor shall not obtain the Products for resale from any person or entity other than Supplier.

## 3.   PRODUCTS

(a)   "Products" shall mean the stand alone (i.e., not bundled or sold with or as part of any other product, device, instrument or other material) Keller Funnel™ products as amended from time to time, including all modifications, enhancements, derivative works and improvements developed, introduced or acquired from time to time by the Supplier and provided by the Supplier to the Distributor in case lots of 6 boxes where each box contains five (5) individually packaged, sterile, Keller Funnels product code: HA-005 (i.e., 30 funnels per case).

(b)   The Supplier shall be entitled by giving one month's notice in writing to the Distributor to extend the scope of this Agreement to include any product manufactured or supplied by it, or to remove from the scope of this Agreement any obsolete Products provided by the Supplier.

## 4.   TERMS OF SUPPLY

(a)   The supply of all Products from the Supplier to the Distributor shall be governed by the Supplier's terms and conditions of sale as amended from time to time in Supplier's sole discretion, except in so far as they are inconsistent with the express terms of this Agreement. Delivered Products by the Supplier to the Distributor shall be at the Distributor's risk.

(b)   Notwithstanding any other provision of this Agreement, the Supplier reserves the right to decline to accept any order or part of any order for the Products received from or through the Distributor. The Supplier shall in its sole discretion be entitled to discontinue or modify the Products or to replace the Products with other Supplier products.

Keller Medical _____   Vitalife Inc. _____

3 | P a g e

Exhibit 2

5.      PRICES

(a)     The transfer price payable by the Distributor for Products as described in 3 (a) shall be as follows:

        Transfer Price:

        Per each sterile Keller Funnel™                                      $ 45.00

        1 Case of 6 boxes of HA-005 - 1 box of 5 each Keller Funnels™        $ 1350.00

(b)     As mentioned in 3 (a) the products are packaged in box lots that contain 5 (five) each individually packaged, sterile, Keller Funnels™.

(c)     The prices payable under sub-clause (a) may need to be increased from time to time, at the discretion of the Supplier, provided that the Supplier shall give 45 days' written notice to the Distributor of any such increase.

6.      TERMS AND CONDITIONS OF SALES

(a)     The terms of the sale:

        Payment terms are 30 days from date of invoice.

(b)     Products shall be packed in Supplier's standard shipping cartons and delivered to Distributor's carrier F.O.B., Supplier's distribution site. On their delivery, title and risk shall pass to Distributor. Supplier shall deliver Products to the carrier selected by Distributor. In the event that Distributor does not provide written notice of such carrier, Supplier shall select the carrier. All freight, insurance, and all related shipping costs where applicable, shall be paid by Distributor.

(c)     Products shall be packed in Supplier's standard shipping cartons suitable for air or sea handling.

(d)     The Distributor warrants that it is not, at the time of entering into this Agreement, insolvent and knows of no circumstances which would entitle any creditor to appoint a receiver or to petition for winding up or to exercise any other rights over or against its assets.

7.      DUTIES OF THE DISTRIBUTOR

(a)     At its own cost, the Distributor shall use its best efforts to introduce, sell, and at all times to actively promote and extend the sale of all Products in all parts of the Territory, including participation in tenders and attendance as an exhibitor at all major congresses relevant to the products in the Territory and shall at its sole cost and expense without limitation employ on its own behalf a sufficient number of specialized, trained and qualified personnel to promote and sell the Products in the Territory and otherwise operate its business in a professional and ethical manner, in each case in accordance with this Agreement. This provision is of the essence of this Agreement and the basis on which the Supplier has consented to enter into it, and any failure by the Distributor to carry out the provisions of this sub-clause shall be deemed to be a material breach of the Agreement.

Keller Medical                      Vitalife Inc.                      4 | P a g e

                                                                       Exhibit 2

(b)   On an annual basis, Distributor shall submit to Supplier its sales and marketing plan, prepared by Distributor in good faith, for the Products, in the Territory ("Annual Marketing Plan") for Supplier's review and approval within sixty (60) days of the Effective Date of this Agreement. Such plan shall include, at a minimum, anticipated quantities of the Products to be purchased; estimated sales volume; promotional plans and activities, and information on Competitive Products (as defined below). For planning purposes, Distributor shall in good faith, supply on a quarterly basis a projection of required quantity of sterile product for sale and sample product for training. Distributor shall update the Annual Marketing Plan and provide such updated plan to Supplier at least sixty (60) days prior to each anniversary of the date the first Annual Marketing Plan was approved by Supplier. Upon Supplier's approval, Distributor shall implement the Annual Marketing Plan.

(c)   In purchasing the Products, the Distributor shall be bound by the Supplier's conditions of sale and from time to time the Supplier may in its sole discretion make modifications in selling the Products. Distributor agrees that the continued maintenance of an image of excellence and ethical marketing of the Products is essential to the continued success of both parties and accordingly Distributor:

(1)   shall not engage in deceptive, misleading, or unethical practices that are or might be detrimental to Supplier, the Products, or the public, including any such practices directed at Competing Products;

(2)   shall make no false, misleading or deceptive statements or representations, either orally or in any written materials, with regard to Supplier, Distributor or the Products;

(3)   shall not make any promises, representations, warranties or guarantees with reference to the Products except as are consistent with those conditions or as are expressly authorized in writing by the Supplier.

(d)   The Distributor shall use only marketing and advertising material for the Products which incorporates the Trade Marks and has been approved by the Supplier in terms of content, design and artwork and comply with any directions or guidelines in relation thereto issued by the Supplier from time to time.

(e)   The Distributor shall not incur any liability on behalf of the Supplier nor in any way purport either to pledge the Supplier's credit or to accept any order or to make any contract binding upon the Supplier.

(f)   The Distributor shall promptly bring to the notice of the Supplier any information which it now has or may be received by it in the future which is likely to be of interest, use or benefit to the Supplier, in relation to the marketing of the Products whether in the Territory or otherwise.

(g)   The Distributor shall notify Keller Medical within 24 hours of the occurrence of any complaint. A complaint, includes, but is not limited to the following events:
   • Alleged or actual Product malfunction;
   • Alleged or actual injury to patients or operators (even if caused by use error);
   • Potential counterfeiting;

(h)   This notification provided by the Distributor shall include the following information:
   • The name of the device
   • The date the complaint was received;
   • The date the event occurred;
   • The lot number of the device;
   • The name, address, and phone number of the physician;
   • Description of the complaint (What happened?);
   • Whether or not the patient or operator experienced an injury and, if so, the nature of the injury

Keller Medical          Vitalife Inc.                              5 | Page

Exhibit 2

(i)   The Distributor shall maintain distribution records that contain the following information:
  - The name and address of the initial consignee;
  - The identification and quantity of devices shipped;
  - The date shipped; and
  - Lot number shipped.

(j)   The Distributor shall not alter the Products or their packaging and shall comply fully with the legal and health requirements for the Products and their use, sale and traceability in the Territory.

(k)   Notwithstanding termination of this Agreement, the Distributor shall retain for a minimum period of five (5) years all traceability records including lot numbers and will comply fully with the Suppliers' instructions for any recall of Products or requests for information regarding traceability of any Product. Traceability records will not be destroyed without the written authorization of the Supplier.

(l)   In dealing with or handling the Products, the Distributor shall follow the reasonable instructions of the Supplier, and shall provide storage for the Products to a standard so as to ensure no contamination or infection thereof, and no deterioration in the quality or appearance thereof.

(m)   Distributor shall keep the Supplier fully informed of any change in the shareholdings or control of the Distributor or management of its business.

(n)   In the event of a dispute arising between the Distributor and a customer or prospective customer, the Distributor shall inform the Supplier and provide the Supplier with details of circumstances of the dispute and Distributor will not enter into any compromise in respect of it or release any debt without the prior written consent of the Supplier.

(o)   The Distributor shall submit to the Supplier full details and copies of all reports, applications, submissions and correspondence to any government department or Regulatory Body, which have been compiled for Registration or other purposes in terms of this Agreement. Furthermore, the Distributor shall also submit to the Supplier any decisions, determinations, certificates and other documentation which it receives from any government department or Regulatory Body in relation to Registration matters or otherwise for the purposes of this Agreement.

(p)   The Distributor agrees that Supplier owns all right, title and interest in the Products and all Intellectual Property rights in the Products, and the Distributor shall ensure that it takes all steps as the Supplier may require to safeguard such interests in such Intellectual Property and, shall ensure that such Intellectual Property is clearly marked as confidential and proprietary to the Supplier (as appropriate). In addition, the Distributor shall ensure that it properly notifies any Regulatory Body in the Territory to whom it makes any report, application or submission of the rights given to the Supplier under this Agreement with respect to Registrations. The sale of the Products hereunder to Distributor does not and will not be deemed to confer upon Distributor any right, interest or license in any Intellectual Property that Supplier or any third party may have in the Products or otherwise and shall not confer on Distributor any right to manufacture or have manufactured, duplicated or otherwise copied or reproduced any of the Products or any part or component thereof. Supplier shall retain exclusive ownership of all proprietary rights in and to all documentation and other data and materials pertaining to any Products. All rights not expressly granted to Distributor in this Agreement are reserved by Supplier.

(q)   The Distributor shall conduct its business in accordance with (including without limitation maintaining records as necessary to comply with and demonstrating its compliance with) all

Keller Medical _____   Vitalife Inc. _____                                    6 | P a g e

Exhibit 2

applicable laws, rules and regulations with respect to the sale of the Products in the Territory .

(r)     The Distributor will indemnify, defend and hold harmless the Supplier from and against any and all loss, damages or liability (whether criminal or civil) suffered, and legal fees or costs incurred by the Supplier resulting from a breach of this Agreement by the Distributor including without limitation any instance of negligence or default of the Distributor's agents, employees, licensees, other representatives or customers.

(s)     <u>Prohibited Sales</u>. Distributor agrees not to sell, and agrees to use commercially reasonable efforts to ensure that Distributor's agents and customers do not sell or use, any of the Products outside of the Territory.

8.     DUTIES OF THE SUPPLIER

(a)     The Supplier hereby undertakes and agrees with the Distributor that it will, at all times while this Agreement is in force, observe and perform the terms and conditions hereof,

       (i)     The Supplier agrees to use reasonable commercial efforts to fulfill orders received from the Distributor, but shall be under no liability to the Distributor for any delay or failure to make delivery of Products, other than a delay or failure caused by its own willful default to comply with the terms of an order accepted by it.

       (ii)     the Supplier agrees to supply to the Distributor or (alternatively, at the Supplier's discretion) directly to any Regulatory Body such information relating to the Products manufactured by the Supplier which the Distributor may reasonably require to enable the Distributor to register, promote and sell the Products in the Territory.

       (iii)     the Supplier may decline to supply to the Distributor information relating to the Products or such similar products which is valuable proprietary information of either the Supplier or third parties

       (iiii)     the Supplier agrees, for the duration of this Agreement, to provide the Distributor with such technical advice as the Distributor shall reasonably require in order effectively to carry on its business relating to the Products.

9.     PRODUCT LEVELS

(a)     There is no minimum requirment for the volume of product purchased per order other than a case of HA-005.

(b)     The Distributor shall provide feedback on increasing sales within the Territory. The Supplier shall be entitled to either terminate this Agreement, or seek a remedy that may include modifying the contract to add minimum order requirements in sub-clause 9 (b) if sales should drop below the average of the previous two year's volumes.

(c)     In addtion to the initial stocking order Keller Medical will provide at the Distrubutor's sole cost and expense the following marketing materials in support of the distribution of the Keller Funnel:

       a) 24 ea Non-Sterile, Keller Funnels for demonstration      $ 300.00 per bundle
       b) 100 ea Keller Funnel Product Brochure             $ 48.00 per bundle(d)

Keller Medical ⟋⟍⟍     Vitalife Inc.             7 | P a g e

Exhibit 2

10.   PROMOTION AND RESTRICTIONS

(a)   Distributor shall not promote or sell, directly or indirectly, any products manufactured or offered for sale by another person or entity, which product competes with the Products (each, a "Competing Product"). Distributor warrants that it does not promote or sell, directly or indirectly, any Competing Products as of the Effective Date.

(b)   In order to further sales of the Products, the Distributor agrees that during the term of this Agreement, the Supplier shall be entitled to make reference to the Distributor (including relevant contact details, and in particular, the name of an individual contact) on its website and marketing and advertising literature as being the distributor for the Products in the Territory; and to set up, with the Distributor's assistance, a link or connection from the Supplier's website from time to time to the Distributor's website (if any), from time to time to enable the Supplier's customers to navigate seamlessly to the home page of the Distributor's website or directly to other appropriate pages of the website relating to the Products.

11.   INDEMNIFICATION AND WARRANTIES

(a)   The Supplier warrants to the Distributor that all Products supplied to the Distributor will conform to the technical description of the Products published publicly by the Supplier ("Warranty") and will be manufactured with reasonable care and will not be defective at time of shipment, will have information in printed form about the use of the Products, and any conditions of such use which are necessary to ensure safety, together with any appropriate warnings or cautions.

(b)   **EXCEPT FOR THE WARRANTY, SUPPLIER MAKES NO WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE PRODUCTS, ANY TRAINING, AND ANY SERVICES PROVIDED UNDER THIS AGREEMENT, AND SUPPLIER HEREBY DISCLAIMS ALL OTHER WARRANTIES AND REPRESENTATIONS OF ANY NATURE, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. THE WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE.**

(c)   If any Products covered by the Warranty do not conform with the terms of such Warranty, the Distributor shall be entitled to require the Supplier to take back such Products for examination and, if shown by such examination to be defective, to replace them with Products conforming to the terms of the said Warranty, provided that any such defective Products are returned promptly to the Supplier, along with full quality control details and in compliance with the Supplier's Product return procedures.

(d)   Any Product to be returned must have prior authorization by the Supplier before it is returned by the Distributor and any returned product which has been in contact with human tissue, or suspected of being contaminated with biohazardous material must be accompanied by a decontamination certificate from the third party and properly packaged and labeled as such.

(e)   Supplier will defend Distributor with respect to any claim, suit, or proceeding (each, a "Claim") brought against Distributor by a third party to the extent that such Claim alleges that the Products infringe any U.S. patent of which Supplier had actual knowledge on the date it first shipped the allegedly infringing Product, provided that Supplier will have no obligation hereunder for any such

Keller Medical _____   Vitalife Inc. _____                    8 | P a g e

Exhibit 2

Claim that arises out of (i) the combination of the Products with any other hardware, device or other product;,(ii) any misuse or abuse of Products by the Distributor any third party; (iii) any alteration, adaptation, modification, change or adjustment to Products by the Distributor or any third party, not previously approved by the Supplier in writing; or (iv) any failure by the Distributor or any third party to follow any operational or storage instructions or guidelines for the Products. If the Products become, or in Supplier's opinion are likely to become, the subject of any infringement claim, Supplier may, at its option and expense, either (x) procure for Distributor the right to continue using the Products; (y) replace or modify the Products so they become non-infringing; or (z) accept return of the Products. The foregoing indemnification obligations are Distributor's sole and exclusive remedy, and Supplier's entire liability, for any claims of intellectual property infringement by the Products.

(f)     Once the Products are delivered to the Distributor, the Distributor has complete right of ownership of the Products and shall indemnify, defend and hold harmless the Supplier in respect of any proceedings, action or claim of any nature whatever against the Supplier made or brought by a purchaser of the Products from the Distributor, except in cases involving manufacturer's or product's defect as well as non-performance while in compliance with Clause 7 (c).

12.     LIMITATION OF LIABILITY

        This section is deleted.

13.     CONFIDENTIAL INFORMATION

(a)     Supplier may disclose certain Confidential Information to Distributor to permit Distributor to perform its obligations under this Agreement. Distributor shall not use any Confidential Information for any purposes or activities other than those specifically authorized in this Agreement, and shall not disclose any Confidential Information to third parties without Supplier's prior written approval. The foregoing use and disclosure restrictions with respect to Confidential Information shall apply during the Term and after the Termination Date. The Distributor shall have the burden of establishing any of the foregoing exceptions by clear and convincing evidence. Without limiting the foregoing, Distributor shall not publish any technical description of the Products beyond the descriptions published publicly by Supplier.

(b)     The Distributor agrees that it shall not disclose to any third party any Confidential Information of the Supplier, and that the Distributor will use such Confidential Information only for the purposes of fulfilling its obligations under this Agreement.

(c)     The Distributor agrees that Confidential Information will be returned to the Supplier immediately upon request with all copies, and that no copies will be retained by the Distributor or any agents  appointed by the Distributor and, upon Supplier's request, shall certify in a writing signed by an officer of Distributor that it has done so.

14.     REGISTRATIONS AND INTELLECTUAL PROPERTY

(a)     The Supplier authorizes the Distributor to use the Trade Marks and other registrations in the Territory in relation to the Products for the purposes of exercising its rights and performing its obligations under this Agreement.

(b)     Except as provided in sub-clause 14(a), the Distributor shall have no rights in respect of any Trade

Keller Medical                    Vitalife Inc.                              9 | P a g e

                                                                            Exhibit 2

Marks or registrations used by the Supplier in relation to the Products or of any associated goodwill, the Distributor acknowledges that, except as expressly provided in this Agreement, it shall not acquire any rights in respect thereof and that all such rights and goodwill are, and shall remain, vested in the Supplier.

(c)    In relation to the Intellectual Property of the Supplier, the Distributor agrees that it shall not cause or permit anything which may damage or endanger the Supplier's rights to the Intellectual Property or the Supplier's title, or assist or allow others to do so; and shall bring to the attention of the Supplier any improper or unlawful use or infringement, and without prejudice, use its best efforts to safeguard the rights and the interests of the Supplier.

(d)    If at any time during this Agreement the Distributor makes or discovers any improvements to the Products or the marketing of the Products, the Distributor will provide the Supplier with all relevant details and Distributor acknowledges that the property in any such improvement shall be assigned to and owned by the Supplier.

(e)    The Distributor shall not:

    (i)    alter, remove or tamper with any Trade Marks, numbers or other means of identification used on or in relation to the Products;

    (ii)    use any of the Trade Marks in any way which might prejudice their distinctiveness or validity or the goodwill of the Supplier therein;

    (iii)    use in the Territory any Trade Marks or trade names so resembling any Trade Mark or trade names of the Supplier as to be likely to cause confusion or deception; or

    (iiii)    apply for registration of, or use, any internet domain name so resembling any Trade Mark or trade name of the Supplier as to be likely to cause confusion or deception.

(f)    In relation to Registrations the Distributor at its sole expense agrees that:

    (i)    in so far as it is competent under the laws of the Territory, the Distributor shall apply for and obtain all Registrations and at all times shall maintain and renew such Registrations in the Territory;

    (ii)    the Distributor shall not allow any Registrations to lapse and will apply for any renewal of such Registrations;

    (iii)    the Distributor shall at all times act in accordance with the laws, rules and regulations of the Territory, the United States and any other applicable jurisdiction (including without limitation the U.S. Foreign Corrupt Practices Act) and shall not commit any act which would adversely affect the Registrations;

    (iiii)    it shall take all such steps and do such things as may be required in order to transfer to the Supplier the benefit of the Registrations under the laws of the Territory, including executing any document or documents required to effect such transfers under the laws of the Territory, in compliance with all formalities of the laws of the Territory;

Keller Medical    Vitalife Inc.        10 | P a g e

Exhibit 2

SJ2019CV13302 19/08/2020 11:27:23 am Entrada Núm. 16 Página 11 de 13

15.   AGREEMENT TERM

(a)   Subject to the provisions for early termination, the agreement shall continue in force until March 31, 2020.

(b)   During the period of 45 days prior to the termination of this Agreement, pursuant or otherwise upon   the giving of notice by the Supplier to the Distributor to terminate this Agreement, the Supplier shall be entitled to appoint the Distributor's successor (if any) and allow him to make himself known as the Supplier's distributor able to do business from the day after the termination of this Agreement.

16.   EARLY AGREEMENT TERMINATION

(a)   Either party may terminate this agreement at any time, provided that they give the other party not less than 45 days written notice to expire or at any time after such date if either party:

        (i)    Shall have committed a breach of this Agreement

        (ii)   Is unable to pay its debts or enters into liquidation, whether compulsorily or voluntarily, or compounds with or convenes a meeting of its creditors, or has a receiver appointed of all or any part of its assets, or takes or suffers any similar action in consequence of a debt, or ceases for any reason to carry on business or any similar occurrence under any jurisdiction affects the Distributor.

(b)   If there is a change in control of ownership of the Supplier, then the Distributor may elect to terminate this Agreement; if there is a change in control of ownership of the Supplier, the Supplier may terminate this Agreement for any reason whatsoever without cause.

(c)   Upon the termination of this Agreement, the Distributor shall cease to hold itself out as having any rights to distribute the Products, except for the purpose of fulfilling orders accepted by it prior to the date of termination, but it is agreed that in the event of termination of this Agreement, the Distributor shall be entitled to sell any stocks of Products which it may still have at the date of termination.

(d)   The Distributor shall, at its own sole cost and expense, promptly return to the Supplier any promotional samples and materials.

17.   ASSIGNMENT

(a)   Distributor may not assign, delegate or otherwise transfer any right or obligation of Distributor under this Agreement whether by agreement, operation of law, or otherwise, without the express prior written consent of Supplier. Any purported assignment, delegation, or transfer in violation of the previous sentence will be null and void. Subject to the foregoing, this Agreement in its entirety will bind each party and its permitted successors and assigns.

18.   FORCE MAJEURE

(a)   Neither party shall be liable to the other for any default hereunder, where the default is due to causes beyond  the control of the party in default, provided that any party seeking to rely on this provision shall give written notice to the other containing full particulars of the act or matter which it claims has put the

Keller Medical _____   Vitalife Inc. _____                    11 | P a g e

                                                                    Exhibit 2

due performance of its obligations under this Agreement beyond its control, and provided further that this clause shall cease to apply when such act or matter has ceased to have effect on the performance of this Agreement.

19.   GOVERNING LAW

(a)   This Agreement shall be governed by the laws of the state Florida without regard to its conflicts of law rules and the parties consent to exclusive jurisdiction and venue in the courts in Florida.

20.   NOTICES

(a)   Any notice or other communication required or permitted by this Agreement to be given to a party shall be in writing and shall be deemed given if delivered personally or by commercial messenger or courier service, or mailed by U.S. registered or certified mail (return receipt requested), to the party at the party's address written below or at such other address as the party may have previously specified by like notice. If by mail, delivery shall be deemed effective three business days after mailing in accordance with this clause.

　　　　(i)   If to the Company to:   Howard Preissman
　　　　　　　　　　　　　　　　　　1239 S. E Indian street, Suite 112
　　　　　　　　　　　　　　　　　　Stuart, FL 34997 USA

(b)   If to Distributor, to the address for notice on the signature page to this Agreement or, if no such address is provided, to the last address of Distributor provided by Distributor to the Company.

21.   REGULATORY REQUIREMENTS

(a)   The Distributor acknowledges that the Supplier is subject to regulation by regulatory bodies in the countries in which they operate. The Supplier needs to be able to comply with the requirements of their regulators and all legal requirements of the countries in which they operate. The Distributor agrees that it shall give the Supplier all assistance and information required to comply with these requirements.

22.   AGREEMENT AND GENERAL VARIANCE

(a)   This Agreement constitutes the entire understanding of the parties and there are no promises, terms, conditions or obligations, whether oral or written, express or implied, other than those contained or referred to herein, and no amendment shall be valid unless accepted in writing by both parties.

(b)   In the event that any provision of this Agreement is declared by any judicial or other competent authority to be void, voidable, illegal or otherwise unenforceable in whole or part, the other provisions of this Agreement and the remainder of the affected provision shall remain in full force and effect.

Keller Medical _____   Vitalife Inc. _____   12 | P a g e

Exhibit 2

SJ2019CV13302 19/08/2020 11:27:23 am Entrada Núm. 16 Página 13 de 13

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

Distributor                                          KELLER MEDICAL, INC.

By: _____           By: _____

Name: Carlos A. Sanchez Vazquez        Name: W. Scott Wade

Title: President _____         Title: Chief Operations Officer

Keller Medical _____ Vitalife Inc. _____          13 | P a g e

                                                             Exhibit 2

# Keller Medical, Inc.

6/12/2017

To: Our International Distribution Partners

From: Scott Wade, COO Keller Medical Inc.

Subject: Acquisition of Keller Medical Inc. by Allergan plc

I am contacting you to inform you that Keller Medical Inc. has agreed to be acquired by Allergan PLC and expects for the transaction to close within the next sixty days. At this time we are not able to provide you with guidance on Allergan's strategy on integration of the business or its future plans for ongoing distribution of the funnel. During this closing period the AGN team will be educating themselves on the details of our current business operations and valued business partners. As definitive information becomes available, we will be communicating directly with you on a timely basis.

We are committed to uninterrupted operations by continuing to provide our distribution partners and ultimately our end user customers with the Keller Funnel® and continued excellence in customer service. All orders will continue to be processed according to our routine business practices.

Please do feel free to contact me as I am happy to try to answer any questions that you may have based upon our limited information at this time.

Thank you again for your partnership as a distributor of the Keller Funnel®.

Regards,

Scott Wade
COO
Keller Medical Inc.

1239 S.E. Indian Street, #112   .   Stuart, FL 34997      772.219.9993      www.kellerfunnel.com

Exhibit 3

**°Allergan**

Bryan E. Smith
Associate Vice President
Senior Counsel

T 714-246-3735
F 714-246-4774
Bryan.Smith@Allergan.com

Allergan plc
2525 Dupont Drive
Irvine, California 92612
www.allergan.com

January 24, 2018

*Sent via Electronic Submission and U.S. Certified Mail*

Vitalife Inc.
1590 Cavalieri St. Urb. Caribe
San Juan, Puerto Rico 00927-6129
Attn: Carlos A. Sánchez Vazquez, President

RE:     Notice of Termination of International Distributor Agreement

Dear Mr. Sánchez:

This letter serves as notice of termination ("Notice") of the International Distributor Agreement dated March 22, 2017, by and between Vitalife, Inc. ("Vitalife") and Keller Medical, Inc. ("Keller Medical") (the "Agreement"), and is effective forty-five days after receipt of this Notice.

Pursuant to Section 16(b) of the Agreement, Keller Medical may terminate the Agreement if there is a change in control of ownership. As a result of Allergan Sales, LLC's acquisition of Keller Medical on June 8, 2017, Keller Medical has undergone a change of control and is entitled to exercise its early termination right.

Within forty-five days of receipt of this Notice, please cease distribution of all Keller Funnel™ products and promptly return materials in accordance with the Agreement. Additionally, Vitalife is prohibited from holding itself out as having any right to distribute Keller Funnel™ products, except for: 1) the purpose of fulfilling orders received prior to the termination date; and 2) selling any stocks of Keller Funnel™ products in Vitalife's possession as of the termination date.

Should you have any questions please do not hesitate to contact us.

Sincerely,

Bryan E. Smith
Assoc. Vice President, Senior Counsel
Allergan plc

Exhibit 4

SJ2019CV13302 19/08/2020 11:27:23 am Entrada Núm. 16 Página 1 de 6



**LMA**

## LUIS A. MELÉNDEZ-ALBIZU & ASSOC., P.S.C.
### Attorney-at-Law

117 De Diego Ave.                                                      Tel. (787) 313-0283
Urb. San Francisco.                                            LMA@melendezalbizulaw.com
San Juan, PR 00927-6310                                 MelendezAlbizuLaw@gmail.com

May 15, 2018

**Via Email:**                                    **Via Email:**
**Robert.Bailey@allergan.com**       **Robert.Bailey@allergan.com**
A. Robert D. Bailey                           A. Robert D. Bailey
Chief Legal Officer & Corporate Secretary    President
Allergan PLC                                    Keller Medical Inc.
5 Giralda Farms                                 5 Giralda Farms
Madison N.J. 07940                           Madison N.J. 07940

**Via Email:**                                    **Via Email:**
**Robert.Bailey@allergan.com**       **Riccardo.Mancuso@allergan.com**
A. Robert D. Bailey                           Riccardo Mancuso
Chief Executive Officer                      Vice President
Allergan Sales, LLC                           Allergan Sales Puerto Rico, Inc.
2525 Dupont Drive 14th                     400 Interpace Parkway Building A
Irvine, CA 92612-1531                       Parsippany, NJ 07054

Re: Allergan's illegal termination of 2017 Agreement between Keller Medical Inc. ("**Keller**") and Vitalife Inc. ("**Vitalife**") granting the latter the exclusive distribution of the Keller Funnel™ products in Puerto Rico.

Dear Messrs. Bailey and Mancuso:

The undersigned attorney represents Vitalife in the matter of reference.

As you may already know, Keller and Vitalife executed an International Distributor Agreement dated October 25, 2011 ("**the 2011 Agreement**"), whereby Keller appointed Vitalife as its exclusive distributor for Puerto Rico and the Caribbean ("**the Territory**") for all Keller Funnel™ products, as amended from time to time, and including all modifications and improvements introduced or acquired from time to time by Keller ("**the Products**"). Thereafter, Keller and Vitalife executed another International Distributor Agreement dated March 22, 2017

Exhibit 5

A. Robert D. Bailey
Riccardo Mancuso
May 15, 2018
Page 2

("**the 2017 Agreement**"), whereby Keller reappointed Vitalife as its exclusive distributor of the Products for the Territory for a fixed term until March 31, 2020. The 2017 Agreement contained a choice of law clause providing that Florida law would govern that Agreement. Since its appointment, Vitalife opened the Puerto Rico market to the Products and has marketed and completed substantial sales within this market. Vitalife has fully complied with all its contractual obligations, has increased the demand and marketability of the Products in Puerto Rico, and has created a distribution of the Products with substantial goodwill and value.

Less than three months after the execution of the 2017 Agreement, on June 7, 2017, Allergan plc ("**Allergan**") announced that its wholly-owned subsidiary Allergan Sales LLC ("**Allergan Sales**"), a Delaware limited liability corporation, was purchasing 100% of Keller stocks via a Stock Purchase Agreement ("**the stock purchase transaction**"). This stock purchase transaction was completed on June 23, 2017. Pursuant to this transaction, Keller became a wholly-owned subsidiary of Allergan Sales.

Keller was already negotiating the stock purchase transaction with Allergan and Allergan Sales when Keller executed the 2017 Agreement on March 22, 2017. However, Keller remained silent and never informed Vitalife, prior to June 12, 2017, that it had been negotiating the sale of its stock to Allergan and that said sale could trigger a termination of the 2017 Agreement. On the contrary, Keller continued supplying Products to Vitalife as per the 2017 Agreement after the stock purchase transaction was finalized on June 23, 2017.

Seven months later, on January 24, 2018, Allergan sent Vitalife a letter dated June 12, 2017 (signed by its Associate Vice President Bryan E. Smith), where Allergan terminated the 2017 Agreement between Keller and Vitalife, based on Section 16(b) of the Agreement providing for early termination due to change in control of ownership of the supplier. Since then, Keller has been selling the Products in Puerto Rico through Allergan Sales Puerto Rico, Inc. ("**ASPPI**"), Allergan's Puerto Rico subsidiary.

Please be advised that Allergan's termination of the 2017 Agreement between Keller and Vitalife was on unlawful and void act under both Florida and Puerto Rico law.

Regarding Florida law, Keller's failure to inform Vitalife of its ongoing negotiations with Allergan and Allergan Sales at the time of execution of the 2017 Agreement constitutes a violation of Florida's implied covenant of good faith and fair dealing. Florida's implied covenant requires the contracting parties both to refrain from frustrating performance of the contract and to take necessary affirmative steps to fulfill the purpose of the contract. Harrison Land Dev., Inc. v. R & H Holding Co., Inc., 518 So. 2d 353 (Fla. 4th DCA. 1998). The implied covenant of good faith and fair dealing protects the contracting parties' reasonable expectations, which in this case means insuring the continuation of the 2017 Agreement until its expiration on March 31, 2020. See Speedway SuperAmerica, LLC v. Tropic Enters., Inc., 966 So. 2d 1 (Fla. 2d DCA 2007).

Exhibit 5

A. Robert D. Bailey
Riccardo Mancuso
May 15, 2018
Page 3

In turn, Allergan may be liable to tortious interference with a business relationship. Gossard v. Adia Servs., 723 So. 2d 182, 184 (1998), Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812 (Fla. 1994); Tamiami Trail Tours, Inc. v. Cotton, 463 So. 2d 1126, 1127 (Fla. 1985), particularly if Keller's breached its implied covenant of good faith and fair dealing at Allergan's or Allergan Sales' behest. ASPRI may also be liable for tortious interference under Florida law.

Regarding Puerto Rico law, although the 2017 Agreement contained a choice-of-law clause providing for Florida law, said choice-of-law clause may be deemed null, void and unenforceable. It is well settled that Florida law voids choice-of law clauses that are contrary to public policy. See Krstic v. Princess Cruise Lines, Ltd., 706 F. Supp. 2d 1271, 1279 (S.D. Fla. 2010) (finding choice-of-law clause void as a matter of public policy despite Defendant's offer to stipulate to applicability of U.S. law); Dockeray v. Carnival Corp., 724 F. Supp. 2d 1216, 1226 (S.D. Fla. 2010) (same). Puerto Rico law already clearly states that choice of law clauses in a distribution agreements between a Puerto Rico distributor and a supplier which provide for the application of a state law other than Puerto Rico's are deemed contrary to public policy and therefore null and void. To that effect, Section 3B of Puerto Rico's Law 75 (10 L.P.R.A. § 278b-2), expressly provides that "*The dealer's contracts referred to in this chapter shall be interpreted pursuant to and ruled by the laws of the Commonwealth of Puerto Rico, and any other stipulation to the contrary shall be void. Any stipulation that obligates a dealer to adjust, arbitrate or litigate any controversy that comes up regarding his dealer's contract . . . under foreign law or rule of law, shall be likewise considered as violating the public policy set forth by this chapter and is therefore null and void.*" Courts have already applied this statutory provision to nullify choice-of-law clauses like the one contained in the 2017 Agreement. Arrocar Distributors, Inc. v. Kis Corporation, 151 F.R.D. 221 (D.P.R. 1993). Pan Am. Computer Corp. v. Data Gen. Corp., 467 F. Supp. 969 (D.P.R. 1979); Southern Intern. Sales v. Potter & Brumfield Div., 410 F. Supp. 1339 (S.D.N.Y. 1976); Walborg Corp. v. Tribunal Superior, 104 D.P.R. 184 (1975). It follows that the 2017 Agreement is fully governed by Puerto Rico law, in particular, Puerto Rico's Law 75, even if the case is tried before Florida courts. See e.g., Caribbean Wholesales and Service Corp. v. U.S. JVC Corp., 101 F.Supp.2d 236 (S.D.N.Y.2000) (diversity action removed from state court in Puerto Rico and transferred to S.D.N.Y under Puerto Rico's Law 75); Harley-Davidson Motor Co. v. Motor Sport, Inc., 6 F.Supp.2d 996 (E.D.Wis.1998) (declaratory judgment under Puerto Rico's Law 75); Whirlpool Corp. v. U.M.C.O. Int'l Corp., 748 F.Supp. 1557 (S.D.Fla.1990).

First, please be advised that Keller is legally responsible to Vitalife under Puerto Rico's Law 75 for the unjustified termination of Vitalife's exclusive distribution of the Products in Puerto Rico. Keller's termination of Vitalife's exclusive distribution, undertaken through Allergan, and caused by Allergan's purchase of Keller's stock, is actionable as an unjustified termination in violation of Puerto Rico's Law 75. Pursuant to Law 75, a protected distribution relationship may not be terminated, impaired or denied renewal by the principal, except only for "just cause", as said term is defined by the law and the courts. Section 2 of Law 75 (10 L.P.R.A.

Exhibit 5

A. Robert D. Bailey
Riccardo Mancuso
May 15, 2018
Page 4

§278(a)) provides that:

> "*[n]otwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contracts on its normal expiration, except for just cause*"

Law 75 was enacted in order to protect the relationship of local Puerto Rico dealers and distributors, representing products and/or services, from impairment or termination by principals, who opened their own local distribution channels and appropriated the local dealer's distribution efforts after the local dealer had opened the market to the product and created a goodwill related the distribution of said products or services. Law 75 has the effect of automatically and indefinitely extending and/or renewing distribution agreements after their expiration date unless just cause occurs.

Vitalife is a protected dealer covered by Law 75. Section 1(a) of Law 75 (10 LPRA §278(a)) defines a protected "dealer" as a "*person actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service.*" Vitalife clearly falls within this definition.

Discontinuance of an established relationship due to the grantor's sale or merger with a third party is not a form of "just cause" allowing the termination of Vitalife's distribution rights. The concept of "just cause" is defined in Section 1(d) of Law 75 (10 LPRA §278 (d)) as the "*non-performance of any of the essential obligations of the dealer's contract, on the part of the dealer, or any action or omission on his part that adversely and substantially affects the interests of the principal or grantor in promoting the marketing or distribution of the merchandise or service*". Termination of an established distribution by a seller due to the sale of its stock to a third party is not a form of just cause as defined in Section 1(d) of Law 75.

In addition, Keller (acting directly or through Allergan and/or Allergan Sales) is selling the Products directly to the Puerto Rico market through Allergan's local subsidiary ASPRI. Section 2A(b)(1)-(2) of Law 75 (10 L.P.R.A. § 278a-1(b)(1)-(2)) expressly presumes that a principal or grantor has impaired the existing relationship "*(1) When the principal or grantor establishes facilities in Puerto Rico for the direct distribution of merchandise or the rendering of services which were previously in the charge of the dealer; (2) when the principal or grantor establishes a distribution relationship with one or more additional dealers for the area of Puerto Rico or any part of said area in conflict with the contract existing between the parties*". Therefore, it is presumed under Law 75 that Keller has unlawfully impaired and/or terminated Vitalife's distribution rights.

Exhibit 5

SJ2019CV13302 19/08/2020 11:27:23 am Entrada Núm. 16 Página 5 de 6

A. Robert D. Bailey
Riccardo Mancuso
May 15, 2018
Page 5

Accordingly, Vitalife is entitled to recover from Keller the substantial economic damages permitted by Law 75. Article 3 of Law 75 (10 L.P.R.A. § 278b) grants in damages to a dealer-plaintiff: (a) lost profits of the last five years or five times the average yearly profit obtained from the line; (b) loss of goodwill of the business attributed to the distribution; (c) actual value of all investments and expenses incurred in the distribution that may not be easily and reasonably used for some other activity; and (d) the cost of parts and inventory on stock that could not be, sold or reasonably used for some other activity. In addition to the damages, Art. 3-A of Law 75 (10 L.P.R.A. § 278b-1) grants dealers a statutory preliminary injunctive relief in order to re-establish the distribution relationship during the course of the litigation, and up to the entry of final and firm judgment. This means that Vitalife can seek immediate preliminary injunctive relief against Keller under Art. 3-A of Law 75 while it litigates its damages claims in court. Finally, Art. 7 of Law 75 grants dealers the right to recover all costs and attorneys fees incurred in the litigation.

**Second**, Allergan, Allergan Sales and ASPRI are also legally responsible to Vitalife for tortious interference with Vitalife's contractual relationship with Keller. The letter of termination is signed by Allergan. Hence, Allergan directly caused the termination of Vitalife's distribution rights with Keller, even though Keller and Allergan are two separate legal entities. Therefore, Allergan is directly liable to Vitalife under Puerto Rico law for tortious interference with Vitalife's contractual distribution relationship with Keller. In addition, Allergan Sales would also be liable for tortious interference, since it allowed Allergan to interfere and terminate the contractual relationship between Vitalife and its subsidiary Keller. Finally, ASPRI would also be liable for tortious interference since it is currently knowingly marketing and selling Products in Puerto Rico in open violation of Vitalife's exclusive distribution rights. Gen. Office Prods. v. A.M. Capen's Sons,115 D.P.R. 553, 558 (1984); New Comm Wireless Servs. v. Sprintcom, Inc., 287 F.3d 1 (1st Cir. 2002). ASPRI's contractual authorization to sell Products in Puerto Rico may be declared null and void. Dennis v. City Federal Savings, 121 D.P.R. 197 (1988). In addition, Puerto Rico law allows the recovery of unrealized gains from the sales of Products made by third parties in breach of Vitalife's exclusivity. El Coqui Landfill v. Mun. de Gurabo, 186 D.P.R. 688 (2012). This means that Vitalife can enjoin ASPRI's sales of Products and claim as damages the profits generated by Allergan, Allergan Sales and ASPRI from the latter's sale of the Products in Puerto Rico.

In sum, Vitalife has several claims available under Puerto Rico law for its unjustified termination, and for Allergan's, Allergan Sales' and ASPRI's tortious interference with Vitalife's contractual relationship with Keller. At the very least, Vitalife is entitled to recover damages under Law 75 for its unjustified termination, plus the additional damages deriving from Allergan, Allergan Sales and ASPRI's tortious interference, plus costs and fees.

In view thereof, please be advised that Vitalife regards the existing 2017 Agreement with Keller to be in full force and operation. Concomitantly, Keller is hereby required to honor and respect its existing exclusive distribution arrangement with Vitalife, which is already protected

Exhibit 5

SJ2019CV13302 19/08/2020 11:27:23 am Entrada Núm. 16 Página 6 de 6

A. Robert D. Bailey
Riccardo Mancuso
May 15, 2018
Page 6

by Law 75. In compliance with its obligations imposed by Law 75, Keller is hereby required to service and dispatch all of Vitalife's purchase orders for Products promptly and based on the existing prices and payment and credit terms. Keller is also required to avoid offering, marketing or selling any of its Products in Puerto Rico either directly or through any third party, including Allergan, Allergan Sales, or ASPRI. Vitalife is already aware that ASPRI is unlawfully accessing Vitalife's customers and it is already selling Products within Puerto Rico. This will not be tolerated. As indicated above, Section 2A(b) of Law 75 provides a presumption that a principal has unlawfully impaired the existing relationship when the principal "*establishes facilities in Puerto Rico for the direct distribution of merchandise or the rendering of services which were previously in the charge of the dealer*", in contravention of the existing contractual relationship between the parties. If Vitalife's distribution rights are not immediately reinstated, Vitalife will move forward with its legal claims against Keller, Allergan, Allergan Sales and ASPRI, which will include a full request of all the damages available by law, as well as the injunctive relief explained above.

I will appreciate if you provide the undersigned attorney with a written response to this letter. If you have any questions of comments regarding the above, please feel free to contact the undersigned at your convenience.

Cordially,

LUIS A. MELENDEZ ALBIZU & ASSOC., P.S.C.

By: /s/Luis A. Melendez Albizu, esq.
Founding Member

001/
cc: Carlos Sanchez (Vitalife)
    Oscar Umpierre (Vitalife)
    Gustavo Sanchez (Vitalife)

Exhibit 5